**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROSA NEHMELMAN for herself and on behalf of similarly situated others,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No. 11 C 23** |
| **PENN NATIONAL GAMING, INC. and EMPRESS CASINO JOLIET CORPORATION d/b/a HOLLYWOOD CASINO JOLIET,** | ) ) ) ) ) | **Magistrate Judge Finnegan** |
| **Defendants.** | ) ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Rosa Nehmelman has filed suit on behalf of herself and similarly situated others seeking to recover unpaid wages due under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.* Specifically, Plaintiff charges Defendants Penn National Gaming, Inc. ("PNGI") and its wholly-owned subsidiary Empress Casino Joliet d/b/a Hollywood Casino Joliet ("Empress") (collectively "Defendants") with violating both wage statutes by failing to pay certain employees for all hours worked per shift, or for hours worked in excess of 40 per week. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Defendants now move to dismiss Plaintiff's Amended Complaint in its entirety. For the reasons set forth here, the motion is denied.

## BACKGROUND[1]

PNGI is a Pennsylvania corporation that "operates, owns and manages" casinos throughout the United States, including Empress in Illinois. (Doc. 8 ¶¶ 5, 10, 11). Plaintiff claims that she and similarly situated others are full-time hourly employees who "work for Defendants as Dealers and Slot Reps in the table games department." (*Id.* ¶ 13). Dealers are responsible for hosting the gambling tables, while Slot Reps are responsible for hosting and managing slot machines. (*Id.* ¶ 16). Employees in both positions are paid on a "per shift" basis rather than by hours worked, and are "typically scheduled for five eight hour shifts, four ten hour shifts or some other combination of shifts which result in 40 hours per week." (*Id.* ¶ 17). Plaintiff contends that this results in employees not receiving overtime pay for all hours worked in excess of 40 per week. (*Id.* ¶ 18).

Plaintiff also alleges that Dealers and Slot Reps are not paid for some of their working hours due to improper casino policies. For example, Dealers and Slot Reps are required to clock in and start working seven minutes before the official start of their scheduled shifts, but are not paid for those extra minutes of work. (*Id.* ¶¶ 19, 20). In addition, though these employees must clock out no later than seven minutes after the official end of their scheduled shifts, they typically work longer than that in order to conclude ongoing games, close out tables, wait for the new shift employees to arrive and/or return keys to the key room. (*Id.* ¶¶ 24-28). Dealers and Slot Reps also receive no pay for their

---

[1]      In reviewing this motion to dismiss, the Court accepts the Amended Complaint's factual allegations as true and draws all reasonable inferences in Plaintiff's favor. *McGowan v. Hulick*, 612 F.3d 636, 638 (7th Cir. 2010).

attendance at mandatory twice-weekly meetings, nor are dealers paid for taking mandatory gaming classes to maintain their dealing skills. (*Id.* ¶¶ 22, 23, 30-33).

Plaintiff filed suit on January 3, 2011, alleging that all of these practices violate the FLSA and IMWL. She seeks to represent a class of current and former Dealers and Slot Reps who worked for Defendants "during the last three years." Defendants have moved to dismiss Plaintiff's Amended Complaint, claiming that pursuant to a prior bankruptcy proceeding, she has no standing to sue under Rule 12(b)(1) and is judicially estopped from recovering in this action. Defendants also contend that Plaintiff has failed to state claims against them under Rule 12(b)(6), and that the Court lacks personal jurisdiction over PNGI under Rule 12(b)(2). Plaintiff challenges these arguments and asks that the motion be denied.

## DISCUSSION

### A.    Standing and Judicial Estoppel

Defendants' first two arguments turn on the fact that Plaintiff petitioned for bankruptcy under Chapter 7 of the Bankruptcy Code on August 24, 2009. At that time, all of Plaintiff's property became part of the bankruptcy estate, including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). *See also In re Stinnett*, 465 F.3d 309, 312 (7th Cir. 2006). Plaintiff did not disclose any wage claims in her bankruptcy filings, but her lawsuit seeks to recover for unpaid wages dating as far back as January 3, 2008. Defendants object that Plaintiff has no standing to sue, and that she is judicially estopped from pursuing these undisclosed claims.

### 1.    Standing to Sue

"Standing is an essential component of Article III's case-or-controversy requirement." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or particular issues." *Id.* (quoting *Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999)). When considering a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *City of Greenville, Ill. v. Syngenta Crop Protection, Inc.*, 756 F. Supp. 2d 1001, 1005 (S.D. Ill. 2010) (quoting *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999)). Plaintiff, however, bears the burden of proving that standing exists, and the Court may consider material outside the pleadings. *Apex Digital*, 572 F.3d at 443; *Berg v. eHome Credit Corp.*, No. 08 C 5530, 2011 WL 761486, at *1 (N.D. Ill. Feb. 25, 2011).

Plaintiff concedes that she is not the real party in interest with respect to any of her wage claims that accrued before August 24, 2009. (Doc. 25, at 4). This is because pre-bankruptcy claims belong to the bankruptcy trustee, for the benefit of the debtor's creditors. *See Hernandez v. Forest Preserve Dist. of Cook County, Illinois*, No. 08 C 5731, 2010 WL 1292499, at *3 (N.D. Ill. Mar. 29, 2010) (citing *Matthews v. Potter*, 316 Fed. Appx. 518, 521 (7th Cir. 2009) and *Biesek v. Soo Line R. Co.*, 440 F.3d 410, 413 (7th Cir. 2006)). There is no dispute that Plaintiff's pre-bankruptcy wage claims were neither scheduled nor otherwise administered by the time the bankruptcy proceeding closed. Those claims thus "forever remain[] property of the estate, and the trustee remains the real party in interest."

*Calvin v. Potter*, No. 07 C 3056, 2009 WL 2588884, at *2 (N.D. Ill. Aug. 20, 2009) (citing 11 U.S.C. § 554(d)).

Defendants argue that because Plaintiff is not the real party in interest with respect to all of her stated wage claims, she lacks prudential standing in this case and her lawsuit must be dismissed. (Doc. 12, at 5). Prudential standing "embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Disability Rights Wisconsin, Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)). It "encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Elk Grove Unified Sch. Dist.*, 542 U.S. at 12. Defendants claim that where, as here, "the debtor lacks standing to sue, the Court does not have subject matter jurisdiction." (Doc. 12, at 5).

Plaintiff responds that she does have standing to sue in this case because new wage claims continued to accrue after August 24, 2009 each time she received a new paycheck. She relies exclusively on *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), in which the plaintiff sought to apply a "paycheck accrual rule" to Title VII cases. *Id.* at 640. The plaintiff urged the Supreme Court to look to FLSA cases, arguing that it was "well established that the statute of limitations for violations of the minimum wage and overtime provisions of the [FLSA] runs anew with each paycheck." *Id.* at 641. The Court did not comment on the merits of this assertion, instead explaining that the FLSA

does not require proof of a specific intent to discriminate and, thus, is not instructive with respect to Title VII discrimination claims. *Id.*

Defendants note that *Ledbetter* is not an FLSA case, and argue that it in no way establishes that FLSA claims accrue each paycheck. Defendants do not offer an alternative accrual theory, but in their view, there is no distinction between pre- and post-bankruptcy wage claims, and Plaintiff should not be allowed to "disown the pre-bankruptcy claims she seeks in her Amended Complaint by way of arguments in her response brief." (Doc. 12, at 3-5; Doc. 27, at 3). The Court agrees that *Ledbetter* does not conclusively establish that FLSA claims accrue each paycheck. That said, courts in this district and others have found that for statute of limitations purposes, FLSA claims do indeed accrue each payday. *See, e.g., Schultz v. American Family Mut. Ins. Co.*, No. 04 C 5512, 2005 WL 5909003, at *5 (N.D. Ill. Nov. 1, 2005) ("An FLSA claim accrues at each regular payday immediately following the work period during which the services, for which compensation is sought, were rendered.") (internal quotations omitted); *Cortez v. Medina's Landscaping, Inc.*, No. 00 C 6320, 2002 WL 31175471, at *1 (N.D. Ill. Sept. 30, 2002) ("As a general rule, an FLSA claim accrues at each regular payday . . ."); *Powers v. Centennial Communications Corp.*, No. 1:08-cv-208-PPS, 2010 WL 746776, at *2 n.1 (N.D. Ind. Feb. 26, 2010) ("FLSA claims accrue at each regular payday . . ."); *Moreno v. United States*, 82 Fed. Cl. 387, 404 n.37 (2008) ("[T]he 'usual rule' is that 'a claim for unpaid overtime under the FLSA accrues at the end of each pay period when it is not paid.'"); *Knight v. Columbus, Ga*, 19 F.3d 579, 581 (11th Cir. 1994) ("[T]he FLSA has been violated each time the [defendant] issued [a plaintiff] a paycheck that failed to include payment for overtime hours actually worked."); *Uriarte v. City of Calexico*, No. 10-cv-498 L(AJB), 2011 WL 9588, at *3

(S.D. Cal. Jan. 3, 2011) ("FLSA claims are continuing claims and a separate cause of action 'accrues' every payday that overtime is not paid.").

To the extent Plaintiff alleges that Defendants failed to pay her overtime and other wages due each time she received a paycheck, and she continued to receive paychecks for work performed after August 24, 2009 until her discharge on December 15, 2010, the Court is satisfied that she has standing to sue for those post-bankruptcy violations. *See Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 516 (7th Cir. 2010) (standing exists where plaintiff suffered an injury in-fact that is fairly traceable to the defendant's actions and capable of being redressed by a favorable court decision). As for Defendants' objection that Plaintiff is improperly disclaiming pre-bankruptcy violations alleged in the Amended Complaint, the Court is aware of no case suggesting that Plaintiff cannot pursue class claims extending back to January 3, 2008 even if she herself can only recover for violations dating after August 24, 2009. *See Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008) ("[I]t is best to confine the term 'standing' to the Article III inquiry and thus to keep it separate from the plaintiff's entitlement to relief or her ability to satisfy the Rule 23 criteria.") Defendants' motion to dismiss for lack of standing is denied.

## 2. Judicial Estoppel

Defendants contend that even accepting that Plaintiff has standing to sue, she is judicially estopped from pursuing any wage claims because she failed to mention them in her bankruptcy filing. Judicial estoppel is an equitable doctrine designed to "prevent the perversion of the judicial process." *Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006) (quoting *Matter of Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990)). It embodies the concept that "a party who prevails on one ground in a lawsuit may not in another lawsuit

repudiate that ground." *United States v. Christian*, 342 F.3d 744, 747 (7th Cir. 2003).  It

may apply where: "(1) the later position is clearly inconsistent with the earlier position; (2)

the facts at issue are the same in both cases; (3) the party to be estopped convinced the

first court to adopt its position; and (4) the party seeking to assert an inconsistent position

would derive an unfair advantage or impose an unfair detriment on the opposing party if not

estopped." *Id.*

In the bankruptcy context, "a debtor who receives a discharge by concealing the

existence of a chose in action cannot wait until the bankruptcy ends and then pursue the

claim." *Sullivan v. Jamison*, No. 06 C 5240, 2011 WL 856591, at *1 (N.D. Ill. Mar. 8, 2011)

(quoting *Williams v. Hainje*, 375 Fed. Appx. 625, 627 (7th Cir. 2010)).  As the Seventh

Circuit has explained, "[b]y making [litigants] choose one position irrevocably, the doctrine

of judicial estoppel raises the cost of lying."  *Cannon-Stokes*, 453 F.3d at 448 (quoting

*Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993)).  This "will assist

creditors in the long run . . . and it will assist most debtors too, for the few debtors who

scam their creditors drive up interest rates and injure the more numerous honest

borrowers." *Id.*

In support of their assertion that Plaintiff is subject to judicial estoppel, Defendants

direct the Court to *Gaskins v. Thousand Trails*, 521 F. Supp. 2d 693, 697 (S.D. Ohio 2007),

in which the plaintiff sought to recover, among other things, unpaid wages under the FLSA

from March 2002 to October 2005.  *Id.* at 695-96.  On August 24, 2004, the plaintiff

petitioned for bankruptcy pursuant to Chapter 7, but she did not disclose any wage claims

either at that time, or before the bankruptcy closed on February 18, 2005. *Id.* at 696.  The

defendant moved for dismissal or summary judgment on the plaintiff's federal lawsuit (filed

on November 3, 2006), arguing that judicial estoppel barred her claims. In granting that motion, the Ohio district court found it "clear that Plaintiff had a sufficient factual basis at the time of the filing of her bankruptcy petition to disclose causes of action relating to the FLSA." *Id.* at 697. The court noted, for example, that the plaintiff alleged that she "regularly" worked more than 40 hours per week. In light of the fact that the plaintiff "was well-aware of the factual basis for these [FLSA] claims prior to the filing of her bankruptcy petition in August 2004," the court found that judicial estoppel barred those claims. *Id.* at 697-98.

Defendants stress that like the plaintiff in *Gaskins*, Plaintiff alleges that she was "regularly" denied her wages and overtime pay starting as far back as January 3, 2008. (Doc. 12, at 4). Defendants contend that Plaintiff therefore "knew" about those undisclosed claims for purposes of Chapter 7, and is now judicially estopped from pursuing them. With respect to wage claims Plaintiff had as of August 24, 2009, the Court agrees, as does Plaintiff herself. (Doc. 25, at 5) ("All pre-petition claims are the property of [Plaintiff's] bankruptcy estate"). Money Plaintiff earned from working at the casino after August 24, 2009, however, is not a part of the bankruptcy estate. 11 U.S.C. § 541(a)(1) (a Chapter 7 debtor's estate includes only property in existence "as of the commencement of the case.") Neither are claims arising from those paychecks. *In re Holstein*, 321 B.R. 229, 235 (Bankr. N.D. Ill. 2005) (quoting *In re Witko*, 374 F.3d 1040, 1042 (11th Cir. 2004)) ("Pre-petition causes of action are part of the bankruptcy estate and post-petition causes of action are not.")

*Gaskins* is not to the contrary in that the plaintiff in that case was attempting to recover personally for wage claims arising before she filed for bankruptcy. There is no

indication that the plaintiff agreed to limit her claims to those arising after the bankruptcy filing date, nor did the court consider any such limitation. The only other cases Defendants cite involve claims that clearly accrued prior to the bankruptcy filing. *See, e.g., Becker v. Verizon North, Inc.*, No. 06-2956, 2007 WL 1224039, at *1 (7th Cir. Apr. 25, 2007) (judicial estoppel applied where plaintiff who filed for bankruptcy under Chapter 13 failed to disclose her pending discrimination and retaliation lawsuit against her former employer); *Calvin*, 2009 WL 2588884, at *3, 4 (failure to disclose to the bankruptcy court EEO claims pending before the bankruptcy was filed "judicially estops [the plaintiff] from pursuing them now."); *Heartland Direct, Inc. v. Chevron U.S.A. Inc.*, No. 06 C 1029, 2006 WL 2524139, at *3 (N.D. Ill. Aug. 30, 2006) (breach of contract claim existing at time of bankruptcy filing was an asset of the estate).[2]

In sum, Plaintiff is not judicially estopped from pursuing wage claims arising from paychecks she received after August 24, 2009, and Defendants' motion to dismiss on this basis is denied.

---

[2]    In response to the Court's request for further information on the accrual and judicial estoppel issues, Defendants cited several additional cases, none of which alters the Court's conclusion. *See, e.g., Bolden v. Wayne Farms LLC*, Civ. A. Nos. 2:07-cv-1006-KS-MTP, 2:07-cv-1007-KS-MTP, 2008 WL 5342122, at *2 (S.D. Miss. Dec. 16, 2008) (providing no details as to when the plaintiffs filed for bankruptcy or the time period covered by their wage claims, but granting unopposed motion for partial summary judgment where "the FLSA claims had accrued at the time the bankruptcy petitions were filed."); *Tate v. Wayne Farms LLC*, Civ. A. No. 2:07-cv-1009-KS-MTP, 2008 WL 5272091, at *2 (S.D. Miss. Dec. 16, 2008) (same); *Miller v. Pacific Shore Funding*, 287 B.R. 47, 50-51 (D. Md. 2002) (plaintiffs' claim under the Maryland Secondary Mortgage Loan Law accrued eleven months before they filed for bankruptcy so they had no standing to sue).

**B.      Rule 12(b)(6)**

Defendants next argue that Plaintiff has failed to allege facts demonstrating that she or the similarly situated others have an employer/employee relationship with them for purposes of the FLSA and IMWL.  In evaluating the sufficiency of a complaint under Rule 12(b)(6), the Court must "construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the nonmoving party's] favor." *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010).  "To survive a motion to dismiss, the plaintiff must do more in the complaint than simply recite elements of a claim; the 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Zellner v. Herrick*, __ F.3d __, 2011 WL 1602066, at *6 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949. *See also Bausch v. Stryker Corp.*, 630 F.3d 546, 558 (7th Cir. 2010).  Although a "formulaic recitation of the elements of a cause of action will not do," *id.* at 1949, a plaintiff need provide "only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008)).

### 1.      Definition of "Employer"

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).[3] "The Supreme Court has instructed courts to construe the terms 'employer' and 'employee' expansively to effect Congress's remedial intent in enacting the FLSA." *Bastian v. Apartment Inv. and Mgmt. Co.*, No. 07 C 2069, 2008 WL 4671763, at *2 (N.D. Ill. Oct. 21, 2008) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)). In determining whether an entity is an "employer," the Court must focus on the "economic reality" of the employment relationship, rather than on "formalistic labels or common law concepts of agency." *Villareal v. El Chile, Inc.*, ___ F. Supp. 2d ___, 2011 WL 856595, at *5 (N.D. Ill. Mar. 9, 2011) (citing *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961)). Factors to consider include whether the employer: "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Alvarez v. Downtown Food Enters., Inc.*, No. 10 C 4509, 2010 WL 5158122, at *2 (N.D. Ill. Dec. 13, 2010).

---

[3]      The IMWL similarly defines "employer" as "any individual, partnership, association, corporation, . . . or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." 820 ILCS 105/3. The IMWL parallels the FLSA, and the same analysis generally applies to both statutes. *See Condo v. Sysco Corp.*, 1 F.3d 599, 600 n.3 (7th Cir. 1993). The Court thus limits its discussion to the FLSA.

### 2.      Plaintiff's Allegations

In the Amended Complaint, Plaintiff alleges that PNGI and Empress both constitute "an employer and an enterprise engaged in commerce or the production of goods for commerce within the definitions of 29 U.S.C. §§ 203(d) and 203(s)."  (Doc. 8 ¶¶ 5, 6). Plaintiff also alleges that she and similarly situated others "are current and former employees of Defendants," and that they "work for Defendants as Dealers and Slot Reps." (*Id.* ¶¶ 1, 3, 13).  According to the Amended Complaint, PNGI "employs on average 120 or more full time Dealers and Slot Reps in each casino it owns and operates," and Empress similarly "employs approximately 120 or more full time Dealers and Slot Reps in its Casino." (*Id.* ¶¶ 14, 15).  Plaintiff describes specific pay practices and policies that Defendants apply to all Dealers and Slot Reps, and claims that they result in the employees receiving less than full wages.

Defendants characterize these allegations as "naked assertions devoid of further factual enhancement," (Doc. 12, at 9), and contend that they do not "plausibly establish an employer-employee relationship."    (Doc. 27, at 8).    In support of this proposition, Defendants rely heavily on *Bohr v. Corrigan Moving Sys.*, No. 09 C 4281, 2009 WL 3517748 (N.D. Ill. Oct. 29, 2009), in which the plaintiff charged defendants Corrigan Moving Systems ("Corrigan") and Larry Stein with violating the FLSA, IMWL and Illinois Wage Payment and Collection Act.  The plaintiff alleged generally that Corrigan and Stein were both her "employer" as defined under the wage statutes, but the court found the allegations as to Stein insufficient.  *Id.* at *1.  The court noted that the plaintiff's "obligation to allege facts showing defendant Stein came within the purview of the applicable statutes requires more than merely pleading 'labels and conclusions.'"  *Id.*  The complaint failed to indicate

that Stein was the general manager of the location where the plaintiff worked, or that she reported to him "during the course of day-to-day tasks and duties performed." *Id.* at *1. The court dismissed the complaint against Stein without prejudice, observing that these deficiencies "may be remediable." *Id.* at *2.

Unlike *Bohr*, there are no individual defendants in this case. In addition, the corporate defendant in *Bohr* did not move for dismissal even though the plaintiff alleged only that she was employed by the company and did not receive compensation for hours worked in excess of 40 per week. *Id.* at *1. Plaintiff here alleges much more, namely that Empress and PNGI determined the rate and method of paying Dealers and Slot Reps by scheduling them on a "per shift" basis, implemented specific time clock rules that deprived them of their full pay, and controlled the terms of their employment by requiring them to attend certain meetings and training classes. *Cf. Puma v. Hall*, No. 1:08-cv-1451-LJM-JMS, 2009 WL 5068629, at *3 (S.D. Ind. Dec. 17, 2009) (dismissing complaint against two companies where the plaintiffs described themselves as "employees" but did not allege that the companies "had the right to discharge them, pay them, or exercise any other sort of control over them."). With respect to Empress, moreover, it is reasonable to infer that Plaintiff and at least some members of the putative class were physically present at Empress while performing their duties, and that they took direction from Empress employees.

Plaintiff has cited several cases suggesting that these allegations suffice to state a plausible claim for relief. In *Nicholson v. UTi Worldwide, Inc.*, No. 3:09-cv-722-JPG-DGW, 2010 WL 551551 (S.D. Ill. Feb. 12, 2010), for example, the plaintiff filed suit on behalf of himself and similarly situated forklift operators seeking to recover overtime pay due under

14

the FLSA and IMWL.  *Id.* at *1.  The court noted that notwithstanding *Twombly* and *Iqbal*, "notice pleading is still alive and well in federal courts, and under that standard a plaintiff need only provide enough details to give the defendant fair notice of the claim and to show that the claim is plausible."  *Id.* at *4 (citing *Tamayo*, 526 F.3d at 1082-83).  The court declined to require the plaintiff to allege "his unpaid hours worked, the approximate dates he worked off the clock, his hourly wage [or] facts necessary to calculate damages."  Rather, the court found it sufficient that the plaintiff complained of not being paid for "overtime" and "listed specific tasks he performed off the clock without pay before work and during lunch breaks."  *Id.*

Defendants urge the Court to take a more restrictive approach and require Plaintiff to plead her wage claims with greater specificity consistent with such cases as *Mell v. GNC Corp.*, No. 10-945, 2010 WL 4668966, at *7 (W.D. Pa. Nov. 9, 2010).  The plaintiffs in *Mell* alleged that the defendants forced them to work "off the clock" in violation of the FLSA.  *Id.* at *7.  The court dismissed the complaint because there was no information as to who told the employees about the "off the clock" policy, what the extra work consisted of, approximately how many extra hours they worked each week without pay, whether anyone complained to a supervisor, or how employees recorded their time.  *Id.*  *See also Jones v. Casey's General Stores*, 538 F. Supp. 2d 1094, 1102 (S.D. Iowa 2008) (dismissing generic allegation that assistant managers were not paid for all hours worked).

This Court finds the *Nicholson* court's approach most compatible with the federal notice pleading requirements, the broad definition of "employer" under the wage statutes, and the standards set forth by the Seventh Circuit.  As the *Nicholson* court observed, FLSA claims are generally simple and do not "require a fuller set of factual allegations to render

them plausible." 2010 WL 551551, at *4. *See also Tamayo*, 526 F.3d at 1084 (reaffirming "the minimal pleading standard for simple claims."); *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 348 (4th Cir. 2005) (reversing dismissal where the plaintiff alleged that the defendant was an employer under the FLSA, identified a specific category of employees who worked overtime without proper remuneration, and described the manner and relevant time period of the violations); *Kemp v. Frank Fletcher Companies, Ltd.*, No. 4:10-cv-1122 JLH, 2010 WL 4096564, at *2 (E.D. Ark. Oct. 18, 2010) (plaintiff stated an FLSA claim against Frank Fletcher Companies, Frank Fletcher Auto Group and Fletcher Chrysler where she alleged that they were her employers, and that they failed to pay her a minimum wage or to compensate her for all hours worked in excess of 40 per week); *Xavier v. Belfor USA Group, Inc.*, Civ. A. Nos. 06-491, 08-949, 06-7804, 08-3736, 2009 WL 411559, at *5 (E.D. La. Feb. 13, 2009) (denying motion to dismiss and accepting as true the plaintiffs' allegations that the defendant "was their employer as that term is defined in the FLSA," "provided them with uniforms, safety training, and tools," and "set their work schedules.").

Defendants insist that none of these cases demonstrates that Plaintiff has stated a claim against PNGI because none "involve[s] a situation where the employee asserted claims against a parent and subsidiary and pled sufficient facts to show a relationship with the parent." (Doc. 27, at 9). Defendants, however, do not cite any parent-subsidiary cases either, focusing instead on the concept of joint employers. In *Chen v. Domino's Pizza, Inc.*, No. 09-107 (JAP), 2009 WL 3379946 (D.N.J. Oct. 16, 2009), for example, the plaintiffs worked as delivery drivers for a Domino's Pizza franchise and sued for unpaid wages under the FLSA and New Jersey Wage and Hour Law. *Id.* at *1. The complaint alleged that franchise owner Marci Hawkins had the power to hire and fire the plaintiffs, controlled the

terms of their employment and signed their checks.  The plaintiffs were required, however, to purchase and wear a Domino's shirt.  *Id.* at *2.

Domino's moved for dismissal due to the plaintiffs' failure to allege facts sufficient to show an employment relationship between them and the company.  The court granted the motion, rejecting as inadequate the plaintiffs' "conclusory statement that Domino's is an employer" within the meaning of the wage statutes.  *Id.* at *4.  The court noted that the plaintiffs' complaint "does not contain a single factual allegation indicating that Domino's had any authority or control over their employment conditions," and held that this failed to satisfy the pleading requirements of *Twombly*.  *Id.* at *4-5.  *See also Leber v. Berkley Vacation Resorts, Inc.*, No. 2:08-cv-01752-PMP-PAL, 2009 WL 2252517, at * (D. Nev. July 27, 2009) (dismissing complaint alleging that the defendants were "a common or joint enterprise" because "[t]he fact that all [d]efendants conduct business in the same industry and utilize similar compensation schemes is insufficient to establish joint employer status.").

Plaintiff denies that she seeks to hold Empress and PNGI liable as joint employers, (Doc. 25, at 6-7), stressing that the FLSA contemplates "several simultaneous employers who may be responsible for compliance with the FLSA."  *Villareal*, 2011 WL 856595, at *4. Regardless, the Court finds *Chen* and *Leber* distinguishable in that this case does not involve franchisees and Plaintiff has alleged facts suggesting that Empress and PNGI both determined the rate and method of paying Dealers and Slot Reps, and controlled their terms and conditions of employment by requiring them to clock in and out at certain times, and to attend pre-shift meetings and training classes.

Though not cited by either party, the Court finds *Tahir v. Avis Budget Group, Inc.*, No. 09-3495 (SRC), 2009 WL 4911941 (D.N.J. Dec. 14, 2009), instructive in light of the

tenets set out in *Nicholson*. The plaintiff in *Tahir* charged several defendants with misclassifying him and others as exempt employees under the FLSA, resulting in them not receiving proper compensation for all hours worked. *Id.* at *1. Defendant Avis Group argued that the complaint against it should be dismissed for failure to adequately allege that the company was the plaintiff's "employer." Avis Group noted that it was "merely the parent of Plaintiff's employer, Avis Rental," and objected that "the Complaint's assertion that 'Defendants' – plural – employed Plaintiff, is conclusory." *Id.* at *9. Avis Group also affirmatively denied that it employed the plaintiff, and stressed that under the New Jersey Law Against Discrimination, "there is generally a strong presumption that a parent company is not the employer of individuals employed by its subsidiary." *Id.*

In denying the motion to dismiss, the New Jersey district court accepted as true the plaintiff's allegation that he was employed by "'Defendants' – which includes Defendant Avis Group," and found this sufficient to state a claim against the parent corporation. *Id.* The court noted that the definition of "employer" under the FLSA is broad, and declined to consider Avis Group's "extraneous" factual assertion that it did not substantially control the terms and conditions of employment at Avis Rental. *Id. See also Arnold v. DirecTV, Inc.*, No. 4:10-cv-00352 AGF, 2011 WL 839636, at *6 (E.D. Mo. Mar. 7, 2011) (citing *Tahir* in declining to dismiss FLSA claims against parent company given broad definition of "employer" and allegations that the plaintiffs were "required to wear 'DirecTV' uniforms and display 'DirecTV' magnets and window stickers on their vehicles.").

As noted, Plaintiff alleges not only that PNGI employs her and the other putative class members, but also that the company controls their rate and method of payment and certain terms and conditions of their employment. Plaintiff provides specific examples of

18

the allegedly unlawful pay practices, identifies the specific employees affected by them, and alleges that all Dealers and Slot Reps are subject to the same practices. Defendants may dispute these assertions, but Plaintiff has set forth sufficient facts to satisfy the pleading requirements of *Iqbal* and *Twombly*.

Defendants object that Plaintiff herself has conceded that the allegations are inadequate by identifying new facts about PNGI in response to Defendants' motion to dismiss. Plaintiff claims, for example, that PNGI "holds itself out as the Putative Collective's employer" in videos posted on its website, including one where Peter Carlino, CEO of PNGI, "explains that PNGI 'is based throughout the United States and Canada, employing nearly 17,000 people' during which a map of the United States is shown with a star for each one [of] its properties, including Empress." (Doc. 25, at 10; Doc. 25-1, Ex. 12, ¶ 7). In another video, Empress worker Marianna Heredia "explains her job as an employee and dealer of PNGI," stating that PNGI "'gives tools you'll need to be a better dealer, a better employee, a better community partner.'" (*Id.*; Doc. 25-1, Ex. 12, ¶¶ 10, 11). Plaintiff also notes that when individuals search for career opportunities on the Empress website, they are directed to a collection of job openings listed on PNGI's website. (*Id.* at 11; Doc. 25-1, Ex. 12, ¶ 13). In addition, Plaintiff and other employees must sign a form acknowledging receipt of PNGI's "Employee Guidance Manual." (*Id.*; Doc. 25-1, Ex. 13).

Defendants are correct that "[a] plaintiff cannot amend h[er] complaint via a response to a motion to dismiss." *Chi v. Loyola Univ. Med. Ctr.*, No. 10 C 6292, 2011 WL 687334, at *2 (N.D. Ill. Feb. 16, 2011). As noted, however, Plaintiffs' allegations are adequate even without these additional facts, so there is no need to require that she file an amended complaint. The Court recognizes that there may be cases where more is

required in order to plausibly plead that two companies are employers under the wage statutes. That said, Plaintiff has satisfied her pleading requirements here where the complaint alleges that both Empress and PNGI are engaged in the casino business, determine the rate and method of paying Dealers and Slot Reps, and control specific terms and conditions of employment, and that PNGI manages and operates its subsidiary casinos. Of course, as new facts emerge through discovery, Defendants may revisit the issue of employer status on a motion for summary judgment. *See Tahir*, 2009 WL 4911941, at *9. At this stage of the pleadings, however, Defendants' motion to dismiss pursuant to Rule 12(b)(6) is denied.

## C. Personal Jurisdiction Over PNGI

### 1. Standard of Review

Defendants finally argue that even if Plaintiff's allegations satisfy *Twombly* and *Iqbal*, the Court still has no personal jurisdiction over PNGI. "In reviewing a motion to dismiss for lack of personal jurisdiction, the Court accepts all well-pleaded factual allegations in the [complaint] as true unless controverted by affidavits outside the pleadings, which the Court may also consider." *Adams v. Raintree Vacation Exchange, LLC*, No. 10 C 3264, 2011 WL 1626561, at *3 (N.D. Ill. Apr. 28, 2011). Personal jurisdiction is governed by the law of the forum state, and may be limited by "the applicable state statute or the federal Constitution." *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010) (citing *Citadel Group Ltd. v. Washington Regional Med. Ctr.*, 536 F3d 757, 760 (7th Cir. 2008)). Illinois's long-arm statute "permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause, . . . so here the state statutory and federal constitutional inquiries merge." *Id. See also Illinois v. Hemi Group LLC*, 622 F.3d 754, 756

(7th Cir. 2010) (quoting 735 ILCS 5/2-209(c)). "The key question is therefore whether [PNGI] has sufficient 'minimum contacts' with Illinois such that the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Id.* at 700-01 (quoting *International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945)).

To determine the propriety and scope of personal jurisdiction over PNGI, the Court must look to the nature of the company's contacts with Illinois. "A defendant with 'continuous and systematic' contacts with a state is subject to general jurisdiction there in any action, even if the action is unrelated to those contacts." *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). "The threshold for general jurisdiction is high; the contacts must be sufficiently extensive and pervasive to approximate physical presence." *Id.* (citing *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 n.16 (7th Cir. 2003)). Where general jurisdiction does not apply, a defendant may still be subject to specific personal jurisdiction if "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Id.* at 702. An exercise of specific personal jurisdiction must "comport with traditional notions of fair play and substantial justice as required by the Fourteenth Amendment's Due Process Clause." *Id.* (citing *International Shoe*, 326 U.S. at 316).

"[A] complaint need not include facts alleging personal jurisdiction," but once a defendant moves to dismiss under Rule 12(b)(2), the plaintiff "bears the burden of demonstrating the existence of jurisdiction." *Purdue Research Found.*, 338 F.3d at 782.

Where the court does not hold an evidentiary hearing on the issue, the plaintiff "need only make a prima facie showing of jurisdictional facts." *Id.*; *Tamburo*, 601 F.3d at 700.

### 2. Analysis

Neither party clearly sets out which form of personal jurisdiction is at issue, but Defendants seem confident that PNGI is not subject to suit here under any circumstances. Defendants argue that the Amended Complaint "does not specifically allege that PNGI itself committed any of the alleged wrongful acts in Illinois; rather, the Amended Complaint only alleges that PNGI owns, operates and manages Empress." (Doc. 12, at 13-14). Defendants also claim that PNGI "has no office, owns no real property, and makes no sales in Illinois." (Doc. 12, at 14). *See IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540-41 (7th Cir. 1998) (to be subject to jurisdiction under the "doing business" provision of the Illinois long-arm statute, nonresident business must be "so like resident businesses, insofar as the benefits they derive from state services are concerned, that it would give them an undeserved competitive advantage if they could escape having to defend their actions in the local courts.")

Plaintiff responds that PNGI is subject to personal jurisdiction because it is an active member of the Illinois gaming community and participates regularly before the Illinois Gaming Board ("IGB"). For example, PNGI is a "Key Member," owner and operator of casinos in Illinois, and is subject to the jurisdiction of the IGB. When PNGI wanted to purchase Empress, it sought and obtained approval from the Board, and entered into a contract with the Board to complete the sale. (Doc. 25, at 14). Though that agreement required PNGI to sell Empress at a later date, PNGI convinced the IGB to let the company keep Empress among its properties. To achieve that result, PNGI's attorney and CEO

"pitched PNGI as a valuable business partner in the Joliet community and Illinois."  (*Id.* at

3).  PNGI has also participated in hearings before the IGB seeking extension of its licenses

at both its Aurora Casino and Empress.  (*Id.*)  On June 23, 2008, moreover, PNGI asked

the IGB to authorize a leveraged buyout of PNGI.  This plan never came to fruition, but the

IGB unanimously approved its terms, including that "PNGI's Illinois assets would be used

as security to secure appropriate financing to complete the acquisition."  (*Id.*)

In addition to these IGB-related activities, PNGI has been a registered lobbyist with

the State of Illinois for the past eight years.  In its most recent registration for 2011, PNGI

seeks to engage in lobbying efforts before both the IGB and the Illinois General Assembly

relating to "[a]ny and all activities that affect or impact business and/or casino riverboat

gaming."  (*Id.*; Doc. 25-1, Ex. 17).  During the 2008 campaign, PNGI donated thousands

of dollars to candidates seeking election to the Illinois General Assembly, and in March

2011, a PNGI representative testified before the General Assembly about a proposed bill

that would allow horse race tracks to have slot machines.  (*Id.* at 15).  PNGI is also "actively

involved in lifting the smoking ban in casinos that have significantly impacted its business."

(*Id.* at 3).

Defendants do not dispute any of these facts, but argue that they do not establish

personal jurisdiction over PNGI.  Defendants first note that Illinois gaming laws require "a

suitability finding with respect to owners," and claim that having a gambling license "does

not establish that PNGI is independently 'doing business' in Illinois."  (Doc. 27, at 11)

(quoting 230 ILCS 10/2, 10/6).  In support of this position, Defendants cite *Polansky v.

Anderson*, No. 04 C 3526, 2005 WL 3557858 (N.D. Ill. Dec. 29, 2005), in which the plaintiff

sought to recover against William Robinson, a resident of Ontario, Canada, in connection

with four horse sales transactions. Robinson submitted an affidavit confirming that he maintained a license to train horses in Illinois, but that he never set up an office, bank account, address or telephone number in the state, and never advertised or designated an agent for service of process there. *Id.* at *4. The court held that "merely holding an Illinois license to train horses does not justify exercising jurisdiction over an international defendant." *Id.* at *4. The court explained that "[u]nlike business corporations, which are deemed to designate the Secretary of State as their agent for service and consent to personal jurisdiction when they register to do business in the state, there is no comparable requirement for licensed trainers." *Id.*

Unlike the defendant in *Polansky*, it appears that PNGI has made affirmative efforts to advance the interests of its licensed Illinois casinos. Plaintiff has submitted evidence indicating that PNGI utilizes its ownership status to purchase casinos in the state, negotiate contract terms, and renew its subsidiaries' licensing rights. *Cf. Polansky*, 2005 WL 3557858, at *5 (indicating that despite his license to train in Illinois, Robinson trained the relevant horses at his facility in Canada). PNGI also does more than just act as a silent owner of the Illinois casinos; it pursues IGB rulings and relief, and engages in lobbying efforts designed to further the interests of those casinos. *See, e.g., Abbott Labs. v. Mylan Pharmaceuticals, Inc.*, No. 05 C 6561, 2006 WL 850916, at *5 (N.D. Ill. Mar. 28, 2006) ("Although [the defendant's] licenses come from an Illinois regulatory agency, and do not automatically establish general jurisdiction, they do represent an ongoing contact with the state of Illinois, and support an inference that [the defendant] intended to do business within the state.").

Defendants stress that a parent corporation's "political activities alone are insufficient to overcome the corporate formalities and subject the parent corporation to personal jurisdiction." (Doc. 27, at 12). They rely on *National Production Workers Union Trust v. CIGNA Corp.*, No. 05 C 5415, 2007 WL 1468555 (N.D. Ill. May 16, 2007), in which the court rejected the plaintiff's argument that the defendant parent corporation was subject to personal jurisdiction because the company had "made direct contact with Illinois by contributing money to various political candidates and political parties." *Id.* at *13. The court found "no evidence that any of these contacts establish a continuous and systematic pattern of business activity sufficient to say that defendant exercises any control over [its subsidiary]." *Id.*

As a preliminary matter, unlike PNGI, the defendant in *CIGNA* was "not the direct parent, nor even the grandparent" of the subsidiary. *Id.* at *5. In any event, it appears that PNGI has done more than contribute money to political parties and candidates. As noted, Plaintiff's evidence suggests that PNGI actively lobbies the IGB and Illinois General Assembly to enact policies consistent with the gaming interests of its Illinois casinos. A PNGI representative has also testified before the General Assembly on at least one occasion. *See Shepherd Investments Int'l, Ltd. v. Verizon Communications Inc.*, 373 F. Supp. 2d 853, 866 (E.D. Wis. 2005) ("[W]hen a defendant lobbies a state legislature, which is charged with running the affairs of the state itself, the defendant necessarily intends to have an impact on the forum.") Moreover, the Court has already concluded that the Amended Complaint sufficiently alleges that PNGI controls the rate and method of payment for Dealers and Slot Reps in Illinois, as well as certain terms and conditions of their employment. And Plaintiff affirmatively alleges that PNGI "do[es] business within the

territorial limits of this District" (Doc. 8 ¶ 5), owns, operates and manages two casinos in Illinois (*id.* ¶¶ 11, 12f, 12k), provides gaming classes in Illinois casinos (*id.* ¶ 31), and pays Illinois Dealers and Slot Reps in such a way that they are denied full wages.

Viewing PNGI's activities as a whole, and accepting Plaintiff's allegations as true, the Court finds that Plaintiff has made a prima facie showing that PNGI's contacts with Illinois are more than "sporadic" and sufficient to withstand a Rule 12(b)(2) challenge to personal jurisdiction. *Compare MAC Funding Corp. v. Northeast Impressions, Inc.*, 215 F. Supp. 2d 978, 980 (N.D. Ill. 2002) (no personal jurisdiction where the defendant's contacts with Illinois over a six-year period included two financing transactions, the purchase of a printing press, equipment leases, and regular purchase of replacement parts from Illinois, and attendance at annual trade shows in Chicago). Defendants' motion to dismiss PNGI is therefore denied. Once again, Defendants may revisit this jurisdictional issue on a motion for summary judgment if the facts warrant such a motion.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss [Doc. 11] is denied.

ENTER:

Dated: May 20, 2011

SHEILA FINNEGAN
United States Magistrate Judge

26