**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **ROSA NEHMELMAN for herself and on behalf of similarly situated others,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No. 11 C 23** |
| **PENN NATIONAL GAMING, INC. and EMPRESS CASINO JOLIET d/b/a HOLLYWOOD CASINO JOLIET,** | ) ) ) ) ) | **Magistrate Judge Finnegan** |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rosa Nehmelman has filed suit on behalf of herself and similarly situated others seeking to recover unpaid wages allegedly due under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.* Specifically, Plaintiff charges Defendants Penn National Gaming, Inc. ("PNGI") and its wholly-owned subsidiary Empress Casino Joliet d/b/a Hollywood Casino Joliet ("Empress") (collectively "Defendants") with violating both wage statutes by failing to pay employees in the Games Department for all hours worked in excess of 40 per week. Plaintiff now moves for judicially supervised notice as to Empress under 29 U.S.C. § 216(b). For the reasons set forth below, the motion is granted. Empress's related motion to strike allegations in two of Plaintiff's supporting declarations is denied.

## BACKGROUND[1]

**A.      Declarations**

In support of her motion for conditional certification, Plaintiff initially submitted her own declaration, and a declaration from Ross Sansone, a former Empress employee who filed a consent to be a party in this case. (Doc. 45-1). Empress in turn submitted twelve declarations from current employees (described below) to oppose certification. Empress also moved to strike significant portions of the declarations from Plaintiff and Sansone, arguing that certain statements were conclusory, speculative, vague and/or not based on personal knowledge, and that other statements constituted inadmissible hearsay. (Doc. 48). When the parties appeared for a hearing on August 11, 2011 (on an unrelated motion), this Court voiced concerns regarding the sufficiency of the declarations from Plaintiff and Sansone.[2] Plaintiff then supplemented the record with new declarations from former Empress employees and Opt-In plaintiffs (the "Opt-Ins") Gustavo DeGuzman,

---

[1]      The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

[2]      Given the lenient standard for conditional certification and the preliminary stage of the proceeding, the Court stated that it was not prepared to disregard information in a declaration solely because it did not meet the standards for admissibility at trial (though this could go to its weight). At the same time, the Court observed that several of the statements in the declarations of Plaintiff and Sansone were quite broad or conclusory such that the Court had no idea what they were based on. Further, the declarations appeared internally inconsistent in certain respects, and Plaintiff had subsequently corrected a number of her declaration statements during a deposition. While the Court indicated that Plaintiff was free to stand solely on the two declarations as the basis for conditional certification, it allowed Plaintiff an opportunity to submit additional declarations on an expedited basis to address the Court's concerns. Plaintiff did so. In addition, Empress submitted Plaintiff's deposition for consideration. To the extent the Court cites any portion of Plaintiff's or Sansone's declarations, Empress's objections are overruled. In all other respects the motion to strike is denied as moot.

2

William Rapka and Bruce Bender.[3] (DeGuzman Decl., Doc. 81; Rapka Decl., Doc. 83, Ex. D; Bender Decl., Doc. 83, Ex. E). The declarations submitted by Empress are from: Human Resources Manager Margaret Deering; Casino Operations Managers John Allison, Chris Costa, Albert Sikirdji and Kevin Taylor; Casino Controller Gordon Hinckle; Dealers David Herron, Marianna Heredia and Franklin Foster; and Slot Representatives Vickie Hejna, Sheryl McMillin and Cordelia Saunders. (Deering Decl., Doc. 55-1; Allison Decl., Doc. 55-9; Costa Decl., Doc. 55-2; Sikirdji Decl., Doc. 55-7; Taylor Decl., Doc. 55-11; Hinckle Decl., Doc. 55-10; Herron Decl., Doc. 55-3; Heredia Decl., Doc. 55-4; Foster Decl., Doc. 55-5; Hejna Decl., Doc. 55-6; McMillin Decl., Doc. 55-8; Saunders Decl., Doc. 55-12). Empress also provided the Court with a copy of Plaintiff's August 9, 2011 deposition transcript, observing that it contradicted certain statements in her declaration. The relevant facts are largely drawn from these documents.

## B. Allegations

Plaintiff worked for Empress as a Dealer in the Games Department from June 1992 until she was terminated on December 15, 2010. (Pl. Decl., Doc. 30-2, Ex. 1 ¶¶ 2, 3). Ross Sansone worked for Empress from February 2009 to April 2011, serving as a Slot Representative ("Slot Rep") and Dual Rate Supervisor in the Games Department. (Sansone Decl., Doc. 46 ¶¶ 2, 3, 5). Gustavo DeGuzman worked for Empress as a Slot Rep from July 26, 1999 until May 31, 2011. (DeGuzman Decl. ¶ 1). William Rapka worked

---

[3]     In her final brief filed on September 21, 2011, Plaintiff submitted a declaration from current Empress Supervisor JoAnne Jenkins. (Jenkins Decl., Doc. 88-1). Empress responded with a motion to strike the declaration pursuant to ABA Model Rule 4.2 and Rule 4.2 of the Illinois Rules of Professional Conduct. That motion remains pending, and the Court has not relied upon the Jenkins declaration in ruling on Plaintiff's motion for conditional certification.

for Empress from approximately November 1997 until he was discharged in May 2011. Throughout most of his employment, he served as a Dual Rate Supervisor, spending about 80% of his time working as a Dealer, and about 20% of his time supervising other Dealers. (Rapka Decl. ¶ 1). Bruce Bender worked as a Dealer for Empress from May 1996 through August 2010. (Bender Decl. ¶ 1).

Plaintiff, Sansone, DeGuzman and Bender were all paid an hourly rate plus tips, and were considered non-exempt employees entitled to receive overtime compensation for hours worked in excess of 40 per week. (Pl. Decl. ¶¶ 5, 6, 14; Sansone Decl. ¶¶ 5, 6, 12; DeGuzman Decl. ¶¶ 2, 3; Bender Decl. ¶¶ 3, 5). Rapka was also an hourly employee, but he only received tips when he worked as a Dealer and not as a Supervisor. (Rapka Decl. ¶ 3). All declarants claim that they "have received some overtime compensation, but . . . have not received overtime compensation for all hours worked" in excess of 40 per week. (Pl. Decl. ¶ 13; Sansone Decl. ¶ 11; DeGuzman Decl. ¶ 3; Bender Decl. ¶ 5; Rapka Decl. ¶ 5).

Plaintiff and the Opt-Ins contend that Empress follows certain practices and policies that result in employees in the Games Department not receiving their required overtime compensation. Plaintiff initially identified seven such policies: (1) Empress has an unwritten policy requiring employees to clock in 7 minutes before their shifts start, but they are not paid for those 7 minutes of work; (2) Empress's Timekeeping Policy requires employees to clock out no later than 7 minutes after their shifts end, and they are not paid for any work performed during those 7 minutes; (3) Dealers and Slot Reps work off-the-clock by attending mandatory pre-shift meetings twice a week for 15 minutes; (4) Empress requires Dealers and Slot Reps to participate in unpaid training courses outside their regular shifts;

(5) Empress pays employees by the shift rather than by the hours reflected on their time cards; (6) Empress requires employees to change into their uniforms at the casino, which takes about 45 minutes, but employees do not get paid for any of that pre-shift activity; and (7) Empress calculates overtime on a two-week rather than weekly basis.

In response to arguments raised by Empress and facts discovered through Plaintiff's deposition, Plaintiff has decided to focus on only the first four of these alleged improper pay practices which, she and the Opt-Ins claim, apply to all similarly situated Empress employees. In that regard, Plaintiff seeks to represent a class of current and former Dealers and Slot Reps who worked for Empress and PNGI from January 3, 2008 to the present. She now asks the Court to approve conditional certification of a collective class against Empress pursuant to § 216(b) of the FLSA, and to allow her to send notice to other potential class members.

Empress objects that conditional certification is inappropriate in this case, arguing that "many policies about which Plaintiff complains are either completely different than Plaintiff represents, are not unlawful or do not exist at all." (Doc. 55, at 2). Empress seeks to strike large portions of the declarations signed by Plaintiff and Sansone on the grounds that they are based on improper supposition and hearsay rather than personal knowledge. In addition, Empress claims that the declarations and other evidence it submitted in opposition to class certification demonstrate that the information provided by Plaintiff and the Opt-Ins is inaccurate, and that a class-wide determination regarding the impact of the casino's policies "is not possible due to the individualized inquiry that would be required." (*Id.*)

**DISCUSSION**

**A.      Standard of Review**

Section 216(b) of the FLSA provides that employees may bring a collective action against an employer to recover unpaid overtime compensation on behalf of themselves and other "similarly situated" employees.  29 U.S.C. § 216(b); *Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010); *Blakes v. Illinois Bell Tel. Co.*, No. 11 C 336, 2011 WL 2446598, at *2 (N.D. Ill. June 15, 2011).  Unlike a class action under Rule 23(b), in which potential plaintiffs are included in the class unless they opt-out, a § 216(b) collective action requires potential plaintiffs to "affirmatively opt-in to the suit by filing a written consent with the court."  *Alvarez*, 605 F.3d at 448.  District courts have broad discretion in managing collective actions, and may facilitate notice to potential plaintiffs in order to implement the opt-in procedure.  *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989); *Gromek v. Big Lots, Inc.*, No. 10 C 4070, 2010 WL 5313792, at *2 (N.D. Ill. Dec. 17, 2010).

"Neither the FLSA nor the Seventh Circuit has set forth criteria for determining whether employees are 'similarly situated'" such that notice is appropriate, but most courts follow a two-step inquiry.  *Rottman v. Old Second Bancorp, Inc.*, 735 F. Supp. 2d 988, 990 (N.D. Ill. 2010) (quoting *Hundt v. DirectSat USA, LLC*, No. 08 C 7238, 2010 WL 2079585, at *2 (N.D. Ill. May 24, 2010)).  At the first step, "the court looks for no more than a 'minimal showing' of similarity."  *Howard v. Securitas Security Servs., USA Inc.*, No. 08 C 2746, 2009 WL 140126, at *5 (N.D. Ill. Jan. 20, 2009).  *See also Nicholson v. UTi Worldwide, Inc.*, No. 3:09-CV-722-JPG-DGW, 2011 WL 250563, at *2 (S.D. Ill. Jan. 26, 2011) (describing the burden as a "modest factual showing").  This is a lenient standard, but "a modest factual showing cannot be founded solely on allegations of the complaint; some factual

6

support must be provided, such as in the form of affidavits, declarations, deposition testimony, or other documents." *DeMarco v. Northwestern Memorial Healthcare*, No. 10 C 397, 2011 WL 3510905, at *1 (N.D. Ill. Aug. 10, 2011) (quoting *Anyere v. Wells Fargo, Co.*, No. 09 C 2769, 2010 WL 1542180, at *2 (N.D. Ill. Apr. 12, 2010)). A plaintiff must demonstrate, through these devices, "a factual nexus between the plaintiff and the proposed class or a common policy that affects all the collective members." *Howard*, 2009 WL 140126, at *2.

In making a determination as to similarity, the court need not accept the plaintiff's allegations as true as it would with a motion to dismiss. "Rather, the court evaluates the record before it, including the defendant's oppositional affidavits, to determine whether the plaintiffs are similarly situated to other putative class members." *Rottman*, 735 F. Supp. 2d at 990 (quoting *Hundt*, 2010 WL 2079585, at *2). At the same time, the court does not consider the merits of a plaintiff's claims, or witness credibility. *Marshall v. Amsted Indus., Inc.*, No. 10-CV-0011-MJR-CJP, 2010 WL 2404340, at *3 (S.D. Ill. June 16, 2010); *Blakes*, 2011 WL 2446598, at *6.

The second step, occurring after discovery, is more stringent. "Once it is known which employees will be part of the class, the Court must reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis." *Rottman*, 735 F. Supp. 2d at 990 (quoting *Jirak v. Abbott Laboratories, Inc.*, 566 F. Supp. 2d 845, 848 (N.D. Ill. 2008)). At that time, a defendant may "move to decertify the case or divide the class into subclasses." *Betancourt v. Maxim Healthcare Servs., Inc.*, No. 10 C 4763, 2011 WL

1548964, at *5 (N.D. Ill. Apr. 21, 2011) (quoting *Smallwood v. Illinois Bell Tel. Co.*, 710 F. Supp. 2d 746, 753 (N.D. Ill. 2010)).

This case is currently at step one of the analysis, and Plaintiff insists that she has easily satisfied her lenient burden of showing that she and other Dealers and Slot Reps are similarly situated with respect to Empress's policies and pay practices. Empress disagrees, arguing that Plaintiff's supporting declarations are deficient, and that she cannot establish that members of the putative class were similarly affected by the casino policies she describes.

## B.     Factual Nexus Binding the Putative Collective

The Court next turns to whether Plaintiff has sufficiently demonstrated that a common policy affects all the putative class members and creates a "factual nexus" between them. *Howard*, 2009 WL 140126, at *2. As noted, for purposes of this motion, Plaintiff focuses on four policies:

(1)     Empress has an unwritten policy requiring Dealers and Slot Reps to clock in 7 minutes before their scheduled shifts, but rounds the time so that employees are not paid for those extra minutes of work;

(2)     Empress has a policy of not compensating Dealers and Slot Reps for closing activities or for time spent waiting for a shift change ("wait time") if these take 7 minutes or less, and of rounding the end time to reflect the scheduled, as opposed to actual, clock out time;

(3)     Dealers and Slot Reps must participate in unpaid meetings before their scheduled shifts; and

(4)     Dealers[4] are not compensated for time spent in job-related training.

(Doc. 58-1, at 9). The Court considers each in turn.

---

[4]     Plaintiff has withdrawn her claim that Slot Reps are required to participate in unpaid training.

## 1.  Time Clock and Rounding Issues

Plaintiff first claims that Empress's time clock and rounding policies factually bind the putative class.  Specifically, she says that Empress requires employees to clock in 7 minutes before their shifts start, and to clock out no more than 7 minutes after their shifts end.  At the same time, Empress rounds actual clock time to reflect scheduled shift times. For example, if an employee clocks in at 8:53 a.m. for a 9:00 a.m. shift, then her time is rounded up to 9:00 a.m.  Similarly, if an employee clocks out at 5:07 p.m. for a shift ending at 5:00 p.m., then her time is rounded down to 5:00 p.m.  (Deering Decl. ¶ 13).  As a result, employees who start working immediately after clocking in 7 minutes early do not get paid for those extra minutes of work.  (*See, e.g.*, Doc. 30-2, Ex. B) (showing Plaintiff clocked-in at 10:53 a.m. on April 12-16, 19 and 20, 2010 but was paid for time starting at 11:00 a.m.). Similarly, since employees are required to continue working until their games end, their replacement workers arrive, or they complete various closing activities, they sometimes work up to 7 minutes past their shift end times, but are not paid for those extra minutes of work either.[5]  Plaintiff claims that these policies deprive employees of pay for "at least, 35 minutes of overtime each week, but often more."  (Pl. Decl. ¶ 20).

---

[5]  To the extent Plaintiff is arguing that employees sometimes were not paid for time worked beyond the 7 minutes, this is an issue not of rounding but of a supervisor's failure to provide a variance for the late clock out.  (*See* Deering Decl. ¶ 14) ("[I]f a Dealer was scheduled to work until 5:00 p.m., but did not get tapped out [by his replacement worker] until 5:10 p.m., the variance would reflect a new end time, which would be rounded to the next quarter hour, to 5:15 p.m.").  It appears to the Court that individual questions would predominate as to whether and why particular supervisors did or did not provide variances in any given situation.

### a. Early Clock-In

Plaintiff identifies several Empress employees who told her about the early clock in policy, including Games Department Director Toni Johnson, and Casino Operations Managers Chris Costa, Albert Sikirdji and Kevin Taylor. (Pl. Dep., Doc. 79-1, at 81-82). DeGuzman claims that Supervisors Pamela Nales, Darlene Phillips and Steve Hurdle all informed him that he had to be at work "on time," meaning 7 minutes before his shift start time. Costa and Taylor also told DeGuzman that being "on time" meant clocking in 7 minutes before his shift began. (DeGuzman Decl. ¶ 10). Rapka says that he received the same information from Costa and another Casino Operations Manager, Greg Mace, and Bender confirms that Johnson told him about the policy. (Rapka Decl. ¶ 12; Bender Decl. ¶ 11). Rapka and Bender further claim that the managers communicated this policy during pre-shift briefings attended by other Dealers and Slot Reps. (*Id.*; Bender Decl. ¶ 11).

In order to ensure that they were "on time," Plaintiff, DeGuzman, Rapka and Bender all lined up with other Dealers and Slot Reps "at the time clock to clock in when the time clock hit seven minutes before the shift began." (DeGuzman Decl. ¶ 11; Pl. Dep., at 71; Rapka Decl. ¶ 13; Bender Decl. ¶ 12). Employees who did not follow this policy "would get an ear full from supervisors" and "[i]f it became a problem it was understood you could be written up." (Rapka Decl. ¶ 13; Bender Decl. ¶ 12). Plaintiff testified at her deposition that if employees did not clock in at the "seven-minute mark," supervisors would "tell you about it." (Pl. Dep., at 77, 79). As Plaintiff explained, "[y]ou might be clocking at 55 [5 minutes before the shift start time], and you go on the floor. And they'll tell you, 'You're late. You need to be on the floor on time.'" (*Id.* at 79).

Empress insists that there is no requirement that employees clock in a full 7 minutes before their shifts start. Rather, the Timekeeping Policy states that employees must clock in "*no earlier than* 7 minutes prior to the start of the shift." (Doc. 30-2, Ex. A) (emphasis added). Human Resources Manager Deering explains that this gives employees a "grace period" when clocking in. (Deering Decl. ¶ 12). Contrary to Empress's suggestion, the existence of such a policy does not conclusively establish that the casino pays employees in compliance with the FLSA. *See, e.g., Russell v. Illinois Bell Tel. Co.*, 575 F. Supp. 2d 930, 935 (N.D. Ill. 2008) ("[T]he mere fact that a company has a written overtime policy does not defeat conditional certification when a plaintiff provides countervailing evidence of a common policy of not paying for overtime.").

Empress has also submitted declarations from Casino Operations Managers Costa, Sikirdji, Allison and Taylor; Dealer and former Slot Rep Hejna; Casino Controller and former Casino Operations Manager Hinckle; and Slot Rep McMillin, confirming that employees can clock in anytime during the 7-minute window, including exactly at the scheduled start time. (Costa Decl. ¶ 7; Hejna Decl. ¶ 6; Sikirdji Decl. ¶¶ 8, 9; McMillin Decl. ¶ 6; Allison Decl. ¶ 6; Hinckle Decl. ¶ 13; Taylor Decl. ¶ 3). In that regard, time cards from Hejna and from Dealer Franklin Foster reflect that both employees sometimes clocked in less than 7 minutes early. (Doc. 63, Exs. 1(A) and (B)).

Even more damaging to Plaintiff's claim, Empress says, is the fact that Bender's and Rapka's time cards also reflect that both employees "clocked in at a variety of times between 7 minutes before the scheduled shift and the start of the shift." (Doc. 87, at 7). Between October 23 and December 17, 2009, Bender worked 38 shifts, but he only clocked in 7 minutes early on 11 occasions. On 12 occasions, he clocked in 6 minutes early, and

on 8 occasions, he clocked in 5 minutes early. (Deering Decl. 2, Doc. 87-1 ¶ 34; Doc. 87-1, Ex. R). Rapka's time records from April 13 to June 4, 2008 similarly show that over the course of 36 shifts, he clocked in 7 minutes early only twice. The rest of the time, he clocked in between 3 and 5 minutes early. (*Id.* ¶¶ 32, 33; Doc. 87-1, Ex. Q).

At this stage of the proceedings, and considering all the evidence presented, the Court is not convinced that Empress has unequivocally shown that employees were not directed to clock in 7 minutes before their shift; indeed, it appears that a number of Dealers and Slot Reps generally did so. *Cf. Adair v. Wisconsin Bell, Inc.*, No. 08 C 280, 2008 WL 4224360, at *5 (E.D. Wis. Sept. 11, 2008) (defendant provided "unequivocal evidence that it does not calculate its employees wages based on the time they are logged onto the phone system."). With only a three-month snapshot of time records from Rapka and Bender, which were hand-selected by Empress, such records are not dispositive.

Empress makes much of Plaintiff's deposition testimony that the 7-minute rule was not uniformly enforced. When asked whether there are "people who can get away with" clocking in less than 7 minutes before a shift start, Plaintiff responded, "[d]efinitely. . . .I've seen people that come in late, and they just tell them not to worry about it . . . . They just give them the first break." (Pl. Dep., at 83). Plaintiff later confirmed that the 7-minute policy "applies to some people, and it doesn't apply to other people." (*Id.* at 253). The mere fact that some supervisors may have exhibited favoritism in enforcing the rule, however, does not unequivocally prove that the rule does not exist or is incapable of class-wide analysis. The time records will reveal who abided by the alleged rule and who did not.

Under the lenient standard applicable here, the Court is persuaded that Plaintiff has presented sufficient evidence that she is similarly situated to other Dealers and Slot Reps with respect to an unwritten policy requiring them to clock in 7 minutes early.

### b. Rounding

Turning to the rounding policy, Empress acknowledges that the time clock rounds to the nearest quarter of an hour so employees are not paid for time worked up to 7 minutes before their shifts start. Nor are employees paid for time worked up to 7 minutes after their shifts end if, for example, they have to wait for a game to end or a replacement worker to arrive. Empress stresses, however, that such a policy is expressly permitted by the FLSA "provided that it is used in such a manner that will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." 29 C.F.R. § 785.48.

Plaintiff argues that the rounding policy always works against the employees. That is, "employees cannot clock in until seven minutes before their shift [so] the time clocks will **always** round up to reflect the scheduled 'Start Time.'" (Doc. 58-1, at 10) (emphasis in original). Similarly, "because an employee must clock out within seven minutes after his 'End Time' Defendants will **always** round down to reflect that employee's scheduled 'End Time.'" (*Id.*) (emphasis in original). Plaintiff claims that where, as here, all rounding works in the employer's favor, it violates the FLSA. (*Id.*). *See Russell v. Illinois Bell Tel. Co.*, 721 F. Supp. 2d 804, 820 (N.D. Ill. 2010) ("If, as plaintiffs allege, Illinois Bell's time rounding and log out policies often caused plaintiffs to work unpaid overtime in increments of under eight minutes, then these company-wide practices may have resulted in unpaid overtime work.").

### 1.    Individualized Inquiries

Empress counters that nothing in the Timekeeping Policy prevents employees from "stopping work and clocking out *before* the end of their scheduled shifts" to "make up for any time rounded away on the front end."  (Doc. 63, at 5) (emphasis in original). To be sure, Plaintiff's own time card shows that on several dates in April 2010, she clocked out three or four minutes early.  (Doc. 30-2, Ex. B).  That still leaves three or four additional minutes while Plaintiff was on-the-clock without pay, but Empress contends that it is not clear whether Plaintiff was actually working during that time.  This is a problem with respect to certification, Empress says, because it demonstrates that the Court would need to make individualized inquiries as to whether each plaintiff was working during the extra minutes before and after his or her scheduled shift.  (Doc. 55, at 24).

In that regard, Empress urges the Court to consider so-called "gap period" cases, which address situations where there is an "interval between an employee's manual punch in time and his scheduled start time [and] between an employee's scheduled end time and his manual punch out time."  *Babineau v. Federal Express Corp.*, 576 F.3d 1183, 1186 (11th Cir. 2009).  In *Babineau*, for example, there was employee testimony regarding "the various non-work-related activities that took place during the gap periods and the various personal reasons that employees listed for coming in early and staying late."  *Id.* at 1192. The court affirmed the denial of class certification under Rule 23(b) because "individualized proof would be required to determine whether employees were actually working during the pre- and post-shift gap periods."  *Id.* at 1191.  *See also Cornn v. United Parcel Serv., Inc.*, No. C03-2001-TEH, 2005 WL 2072091, at *2 (N.D. Cal. Aug. 26, 2005) (denying certification under Rule 23(b) where "individual questions predominate[d] over whether time

spent on [changing into uniforms, shining shoes and punching in] should be counted as hours worked and, if so, how much time, if any, was spent on these activities and improperly excluded.").

Empress claims that as in *Babineau*, Dealers and Slot Reps give varying accounts of pre- and post-shift activities performed while clocked in.  By way of example, Empress notes that Foster often punches in early before using the restroom.  (Foster Decl. ¶ 6). Empress also finds it significant that McMillin and Heredia like to clock in early to avoid being late.  Heredia does not indicate what she does after clocking in, but McMillin states that she gets her Slot Rep key, wallet key and radio, which can take from one to four minutes.  (McMillin Decl. ¶¶ 7, 8; Heredia Decl. ¶ 8).  Like McMillin, Slot Rep Cordelia Saunders also gets her keys and radio after punching in, then obtains her wallet and goes to a supervisor who "counts me into my wallet."  (Saunders Decl., Doc. 55-12 ¶ 8).

As a preliminary matter, the Court does not find Empress's Rule 23 "gap period" cases to be particularly instructive.  Empress correctly notes that in *Burns v. Village of Wauconda*, No. 99 C 0800, 1999 WL 529574 (N.D. Ill. July 15, 1999), the court expressed skepticism as to whether "Congress intended to render Rule 23 wholly irrelevant to the question of class certification under the FLSA."  *Id.* at *2.  The court acknowledged that "some courts" follow the two-step analysis discussed earlier, but also opined that "the requirement of an FLSA class action that all putative class members be 'similarly situated' to the representatives is, on its face, entirely consistent with the requirements of commonality and typicality under Rule 23(a)(2) and (3)."  *Id.*  Ultimately, however, the court found it "unnecessary to decide here which of the[se] competing approaches should be employed in determining FLSA class certification."  *Id.* at *3.

Since the decision in *Burns*, courts have consistently adopted and followed the two-step analysis in FLSA certification cases. Moreover, the FLSA's "similarly-situated requirement has been interpreted as 'considerably less stringent' than that applied to class actions certified under Rule 23." *Perez v. Radioshack Corp.*, 552 F. Supp. 2d 731, 744 (N.D. Ill. 2005). Empress argues that the Supreme Court's recent decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), should nonetheless "guide this Court's analysis" even though it involved a Rule 23 class. (Doc. 63, at 9). Specifically, Empress claims that the following statement "should certainly apply in the FLSA context":

> What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* at 2551 (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009)). As Empress sees it, there will be no common answer to any questions in this case, making certification inappropriate.

*Dukes* is distinguishable from the situation presented here in several respects. Not only did it involve a Rule 23(b)(2) class action, but the plaintiffs there sought injunctive relief for intentional discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* In addition, the policy at issue was notable for "*allowing discretion* by local supervisors over employment matters." *Id.* at 2554 (emphasis in original). The Supreme Court explained that such a policy is "just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against* having

uniform employment practices." *Id.* (emphasis in original). There is no similar policy of discretion with respect to rounding hours in this case.[6]

Even assuming that the gap period cases applied here, it is not clear to the Court how the Empress declarations demonstrate that there is wide disparity regarding whether employees work immediately after clocking in and before clocking out (rather than attend to personal matters). DeGuzman, for example, engages in essentially the same activities as those identified by McMillin and Saunders, though he claims to perform some of that work even before clocking in. Specifically, if DeGuzman was not replacing another worker when he started his shift, he (1) got his machine key, radio and wallet key from the security guard, (2) signed a document with his badge number, and (3) went to the wallet bank and counted it with his supervisor, all before clocking in.[7] (DeGuzman Decl. ¶¶ 14, 15). If DeGuzman was replacing another worker when he started his shift, then he obtained a machine key and radio from the security guard before clocking in. He then clocked in 7 minutes before his shift started, immediately walked out to the floor, got the wallet and wallet key from the person he was replacing, and counted the wallet. (*Id.* ¶ 16). It took

_____

[6] Relying on *Dukes*, Empress also expresses concern that Plaintiff will attempt to conduct discovery on a representative basis, which will not give the casino an opportunity to explore defenses against each individual plaintiff. (Doc. 63, at 8, 9 n.7). The *Dukes* Court declined to certify a Rule 23 class "on the premise that [the employer] will not be entitled to litigate its statutory defenses to individual claims." 131 S. Ct. at 2561. Empress argues that this language demonstrates that the Court "rejected any approach that would extrapolate the results of a series of mini-trials to the much larger group of class members, which is precisely the approach that Plaintiff's counsel advocates here." (Doc. 63, at 9). It is premature to address this issue at such an early stage of the proceedings, when the Court lacks all the necessary information.

[7] DeGuzman says that after January 2011, Empress changed its policy to require Slot Reps to count their wallets after they clock in. (DeGuzman Decl. ¶ 15).

DeGuzman about two minutes to count the wallet, and the person he was replacing could not leave until he finished the count.  (*Id.*).

Bender and Rapka both claim that before they clocked in, they reviewed the "road map," which is "a description of the games . . ., my crew for the night (e.g., four dealers), the tables that I was assigned to work that shift, the dealers we would follow that night, and the order of breaks." (Bender Decl. ¶ 15; Rapka Decl. ¶ 16).  After clocking in, Bender and Rapka would go directly to the casino floor and notify the Casino Operations Manager that they were ready to work.  (*Id.* ¶ 16; Rapka Decl. ¶ 17).  Plaintiff testified that she, too, "proceed[ed] on to the floor" right after clocking in, and Sansone concurs.  (Pl. Dep., at 70; Sansone Decl. ¶ 29).

With respect to clocking out, DeGuzman states that if he was being replaced by someone, "that person would come to the floor before his or her scheduled shift began to get the wallet key from me and count the wallet with me watching." (DeGuzman Decl. ¶ 18).  If DeGuzman was not being replaced, then his supervisor counted the wallet with him watching.  This usually occurred at the wallet bank unless it was busy, in which case the supervisor would count the wallet on the floor.  (*Id.* ¶ 19).  In any event, after the wallet was counted by either the replacement or the supervisor, DeGuzman would go to the security desk to return his machine key and radio.  He was not allowed to clock out until all of these activities had taken place.  (*Id.* ¶ 20).

Rapka claims that when his shift ended, he always shut down the table unless he was an "early out."[8]  To accomplish this, Rapka would take all the chips out of the chip rack

---

[8]  *See infra* pp. 20-21 for a discussion of "early out" breaks.

18

and count them, then notify the supervisor that he was ready to close. The supervisor would come over to the table and "read the chips and the amount of chips into the rack." (Rapka Decl. ¶ 19). Rapka double-checked the supervisor's count and then a second supervisor would be called over to recount the chips. After filling out some paperwork, Rapka would sort the cards on the table, then walk to clock out. (*Id.*).

Based on these declarations, the Court is not convinced that it would need to make significant individualized inquiries to determine whether employees in fact "worked" during the period when they were clocked in.[9] At a minimum, any such individual determinations are not sufficient to preclude certification at stage one of the analysis. Only one declarant stated that he used the restroom after clocking in; all others appear to have immediately commenced working activities. This suggests that the workday begins as soon as an employee clocks in, and continues until he or she clocks out. To the extent employees did not clock in exactly 7 minutes early or clock out exactly 7 minutes after their shifts ended on each and every day, a review of the time cards should reveal how much overtime the employee is entitled to each week. *See Alvarez*, 605 F.3d at 449 n.1.

On the facts presented, Plaintiff has shown that common issues predominate with respect to Empress's rounding policy.

---

[9]     Plaintiff argues that if Empress required employees to clock in 7 minutes early, this is compensable time even if they did not work. (Doc. 88, at 1 n.2) (citing 29 C.F.R. § 790.6).

## 2.    Breaks

Empress argues that the rounding actually benefits Dealers, at least when they take an "early out break."  Empress explains that Dealers work on a group of tables called a "string," and there is always one more Dealer assigned to a string than there are tables. (Foster Decl. ¶¶ 8, 9; Costa Decl. ¶ 12).  As a result, Dealers generally get a 20-minute break after one hour of work, meaning they "could spend as much as two hours of the shift on breaks – even more on a 10-hour shift."  (Doc. 55, at 4).  These breaks are paid. (Foster Decl. ¶ 12; Hejna Decl. ¶ 10).

According to Empress, when a Dealer's final break of the day runs up against the end of her scheduled shift, she can clock out and leave the premises.  The Dealer's manager will note the early out break on a variance sheet, and the hours paid will round up to the full shift.  (Herron Decl. ¶ 8; Foster Decl. ¶ 9).  By Empress's calculation, from January 1, 2008 to May 27, 2011, Hejna was paid for an extra 1,017 minutes (or 16.95 hours) of work over those that she was actually on the clock.  (Doc. 63, Ex. 1(A)).  Foster, similarly, was paid for an extra 333 minutes (or 5.5 hours) of work over those that he was on the clock from May 2010 until May 26, 2011.  (Doc. 63, Ex. 1(b)).

Rapka and Bender insist that Dealers could not in fact leave just because they were on "early out" break.  Instead, Casino Operations Managers "would make them do work including, but not limited to sorting cards, do a push (work for someone to give them a break), and pick up chips at the roulette games (often called muck)."  (Rapka Decl. ¶ 21; Bender Decl. ¶ 21).  Regardless, Plaintiff contends that whether such early out breaks can serve to "offset" overtime payments is a merits issue not properly addressed at step one of the certification analysis.  The Court agrees.  Empress has at best raised a question as

20

to whether early out breaks constitute "hours worked" that can "offset" overtime pay. *See* 29 C.F.R. § 778.320 (noting that parties may agree to provide compensation for hours spent in certain types of activities that would not be regarded as working time under the Act). It would be premature to address this issue now. *See Alexander v. Caraustar Indus., Inc.*, No. 11 C 1007, 2011 WL 2550830, at *2 (N.D. Ill. June 27, 2011) (court declined to consider whether paid lunch periods constituted "hours worked" which could be used to offset overtime, finding the issue "best left for later in the litigation."). Notably, it appears that Empress counts hours worked on "early out" breaks towards overtime calculations, suggesting that the time is in fact "working" time. (Doc. 65-1, at 6).

Even if offset is appropriate, it should be easy to determine from Empress records which employees took the early out breaks and adjust their recoveries accordingly. As the Seventh Circuit explained in *Alvarez v. City of Chicago*,

> If the [plaintiffs] in this litigation ultimately recover, their recovery will be determined by the application of mathematical formulae common to all class members, although the specific variables (number of hours worked, hourly wage, etc.) will vary from individual to individual. However, the individualized facts will likely come in the form of undisputed payroll and time records.

605 F.3d at 449 n.1. In addition, it does not appear that Slot Reps ever get early out breaks that would offset overtime payments. Rather, they receive two paid 15-minute breaks during an 8-hour shift, two paid 20-minute breaks during a 10-hour shift, and a 30-minute unpaid lunch break. (Deering Decl. ¶ 17; Sikirdji Decl. ¶ 15; Taylor Decl. ¶ 11; McMillin Decl. ¶ 19).

In sum, Plaintiff has demonstrated a factual nexus binding Dealers and Slot Reps with respect to whether Empress's time clock policy, together with the rounding policy,

violates the FLSA.  Conditional certification is appropriate on this basis at step one of the analysis.

### 2.    Pre-Shift Meetings

Plaintiff contends that the putative class of Dealers and Slot Reps is also bound by the fact that twice a week, they must attend mandatory, pre-shift meetings.  (Pl. Decl. ¶ 26(b)).  Slot Reps have briefings on Tuesdays and Fridays; Dealers have separate briefings on Mondays and Thursdays, lasting between five and fifteen minutes.  (DeGuzman Decl. ¶ 12; Rapka Decl. ¶ 14; Bender Decl. ¶ 13; Pl. Dep., at 38).  Plaintiff, DeGuzman, Rapka and Bender all state that Casino Operations Managers usually conducted the briefings, though DeGuzman says that supervisors sometimes ran his briefings when the Managers were unavailable.  (Pl. Dep., at 38; DeGuzman Decl. ¶ 12; Rapka Decl. ¶ 14; Bender Decl. ¶ 13).  During the briefings, Managers told Dealers and Slot Reps about promotions, problems, policies that needed to be focused on that week, and other job-related information.  (DeGuzman Decl. ¶ 13; Rapka Decl. ¶ 15; Bender Decl. ¶ 14).

Plaintiff, DeGuzman, Rapka, Bender and Sansone all claim that they were required to attend the briefings, which typically "started before I clocked in seven minutes before my shift began and they often started fifteen minutes before my shift began."  (Pl. Dec. ¶ 26(b); Pl. Dep., at 70; DeGuzman Decl. ¶ 12; Rapka Decl. ¶ 14; Bender Decl. ¶ 13; Sansone Decl. ¶ 26(b)).  To ensure that they were on time for these briefings, Plaintiff and DeGuzman arrived at the casino at least 15 minutes before their shifts began on briefing days, and Rapka and Bender arrived at least a half hour before their shifts began on those days.  (*Id.* at 166-67; DeGuzman Decl. ¶ 12; Rapka Decl. ¶ 14; Bender Decl. ¶ 13).  Plaintiff claims

that due to Empress's clock-in and rounding policies, employees are not compensated for any of their time spent in these pre-shift meetings.

Empress concedes that once or twice a week, some Casino Operations Managers hold briefing sessions with employees just prior to a shift or as a shift is starting in order to reinforce information contained in briefing bulletins posted by the time clock. These briefings cover issues such as new promotions, policy reminders, best practices, and other Human Resources matters. (Doc. 55, at 4-5; Costa Decl. ¶ 19; McMillin Decl. ¶ 11; Allison Decl. ¶¶ 7-8; Sikirdji Decl. ¶ 10). Empress stresses, however, that there is wide variation as to "whether [managers] conduct these briefings, where they occur, how frequently they occur, which shifts they are able to brief and how long the briefings last." (*Id.* at 5).

Casino Operations Manager Sikirdji, for example, used to brief Dealers for three or four minutes on Mondays and Thursdays, but he has not done so since December 2010. (Sikirdji Decl. ¶ 10). Casino Operations Manager Taylor briefs Dealers only once a month for approximately three or four minutes. (Taylor Decl. ¶ 9). Casino Operations Manager Costa tries to brief employees once or twice a week for one or two minutes, but he only manages to do so "about 50% of the time." (Costa Decl. ¶¶ 19, 20). Casino Operations Manager Allison, in turn, does a two to three minute briefing by the time clock when a new bulletin is posted. Prior to December 2010, he conducted this briefing regularly, but he is no longer able to do it consistently. Allison estimates that he usually ends up speaking to only about 15 or 20 percent of the shifts that he oversees. (Allison Decl. ¶¶ 7, 8). The managers all agree that they do not deem the briefings to be mandatory. Moreover, Taylor and Costa do not take attendance, and Hinckle notes that there are no repercussions for

missing a briefing.[10]  (Allison Decl. ¶¶ 8, 9; Costa Decl. ¶ 19; Hinckle Decl. ¶ 7; Sikirdji Decl. ¶ 10; Taylor Decl. ¶ 9).

Several Dealers submitted declarations confirming the variation in briefings.  Heredia says there are pre-shift briefings on Mondays and Thursdays lasting about two minutes. For anyone who misses a pre-shift meeting, the information is available on the bulletin board.  (Heredia Decl. ¶ 9).  Hejna attends briefings approximately once a week for about five minutes.  No one takes attendance and Hejna is "not aware of any consequences for not attending"; she does, however, think it "looks bad not to show up, because then everyone sees that you're running late."  (Hejna Decl. ¶¶ 12, 13).  Foster recalls attending briefings about once a week when he worked the 8:30 p.m. to 6:30 a.m. shift.  The meetings lasted about two to three minutes, but no one took attendance.  Foster claims that everyone was punched in when the meetings started, and that "there was no penalty for not attending."  (Foster Decl. ¶ 14).  Finally, Herron reports that "there used to be briefings" once a week at the start of a shift, lasting two or three minutes.  He describes the meetings as "informal," and says that he "never heard of any repercussions for anyone missing a briefing."  (Herron Decl. ¶¶ 10, 11).

Empress argues that all of this variability regarding pre-shift briefings demonstrates that members of the putative collective are not similarly situated.  As the casino sees it,

---

[10]    Empress does acknowledge that for a two-week period from May 31 to June 7, 2010, the Company tested out a mandatory, twice-weekly pre-shift meeting.  Employees who could not attend the 15-minute meeting at the beginning of their shifts were scheduled to come in 15 minutes before their usual start time.  Empress maintains that employees were paid for this time.  In any event, the casino discontinued the program after two weeks because Casino Operations Managers could not regularly leave the floor to conduct 15-minute meetings for so many shifts.  (Allison Decl. ¶ 9; Sikirdji Decl. ¶ 11).

"significant individual considerations" predominate depending upon the assigned manager and shift. (Doc. 55, at 29-30). Empress relies on cases outside this district in which courts denied certification because the plaintiffs did not allege that all putative class members were subject to "uncompensated, yet identical, and regularly performed tasks." *Thompson v. Speedway SuperAmerica LLC*, Civ. No. 08-1107(PJS/RLE), 2008 U.S. Dist. LEXIS 115050, at *28 (D. Minn. Aug. 21, 2008). In *Thompson*, the plaintiffs themselves conceded that they only "sometimes" performed compensable tasks from home without payment, "but on an irregular basis." *Id.* In *Lawrence v. City of Philadelphia, Pennsylvania*, No. 03-CV-4009, 2004 WL 945139 (E.D. Pa. Apr. 29, 2004), similarly, the prospective plaintiffs worked in "different unit types, different platoons, different locations, and ha[d] different supervisors," and their "off-the-clock" claim did not involve "regularly scheduled time that [wa]s worked by all members of the class." *Id.* at *2. *See also Diaz v. Electronics Boutique of America, Inc.*, No. 04-CV-0840E(SR), 2005 WL 2654270, at *3 (W.D.N.Y. Oct. 17, 2005) (plaintiffs were not similarly situated to each other where one's claims focused on exempt status and the other's claims focused on whether he was denied overtime pay for certain hours worked).

This case is distinguishable from *Thompson* and *Lawrence* in that Plaintiff and the Opt-Ins allege that Dealers and Slot Reps participate in regular pre-shift meetings twice a week. Empress disagrees, pointing to the contrary affidavits from Casino Operations Managers and other Dealers and Slot Reps. At step one of the certification analysis, however, "it is not proper for the Court to assess the credibility of statements made in plaintiff['s] declaration." *Alexander*, 2011 WL 2550830, at *2. Notably, Empress concedes that these briefings do occur in some form at least on occasion, and that due to the

rounding policy discussed above, meetings that take place within 7 minutes prior to the employees' shift start time are not compensated. On these facts, Plaintiff has made her minimal showing that Dealers and Slot Reps are subject to a pre-shift meeting policy that factually binds them.

In a footnote, Empress contends that "[a]ccording to some witnesses, the time at issue [with respect to the pre-shift briefings] is *de minimus* [sic]." (Doc. 55, at 30 n.12). Empress cites cases in which courts granted summary judgment in favor of the defendants with respect to unpaid work activities lasting 10 minutes or less. *See, e.g., Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984) (affirming judgment for defendant where employees spent 7 to 8 minutes in unpaid pre-shift work, and noting that "[m]ost courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable."); *Farris v. County of Riverside*, 667 F. Supp. 2d 1151, 1165 (C.D. Cal. 2009) (granting the defendant's summary judgment motion where unpaid pre-shift donning and doffing activities took no more than 9 minutes per day); *Albrecht v. Wackenhut Corp.*, No. 07 C 6162, 2009 WL 3078880, at *9 (W.D.N.Y. Sept. 24, 2009) (summary judgment granted where unpaid pre-shift activities took no more than 3 to 6 minutes per day); *Hesseltine v. Goodyear Tire & Rubber Co.*, 391 F. Supp. 2d 509, 520 (E.D. Tex. 2005) (claims for unpaid activities taking "ten minutes or less are *de minimis* as a matter of law.").

Plaintiff argues that the *de minimis* rule does not apply to discrete work activities but, rather, to "the aggregate amount of time for which an employee seeks compensation." (Doc. 58-1, at 19 (quoting U.S. Department of Labor Wage and Hour Advisory Memorandum No. 2006-2, at 3)). As a result, Plaintiff says, Empress's attempt to invoke the *de minimis* rule with respect to pre-shift meetings, without regard to the other

challenged activities at issue in the case, must fail.  Plaintiff also relies on *Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F. Supp. 2d 941 (W.D. Wis. 2008), for the proposition that because "the *de minimis* exception was created within the context of 1940's technology," "'one could argue that all time can be recorded to the minute,' which could effectively eliminate the *de minimis* exception."  *Id.* at 954.  Finally, Plaintiff objects that asserting the *de minimis* doctrine in cases involving a rounding policy "would be in direct conflict with 29 C.F.R. § 785.48 that directs the Court to consider . . . small increments [of 5, 6 or 7.5 minutes] of under compensation over a period of time to determine in the aggregate whether the employees are being paid for all hours worked."  (Doc. 58-1, at 20-21).

The Court need not resolve these arguments regarding the viability or applicability of the *de minimis* doctrine.  For purposes of step one of the conditional certification analysis, it suffices that the Court is not persuaded that the *de minimis* doctrine defeats Plaintiff's showing of a factual nexus between herself and members of the putative collective.

### 3.  Training Courses

Plaintiff finally claims that in addition to attending mandatory briefings, Dealers are bound by a requirement that they participate in unpaid training classes.  (Pl. Decl. ¶ 38). Plaintiff contends that these classes count as "working time" because attendance is not voluntary and the training is directly related to the employees' jobs.  (Doc. 88, at 1-2) (citing 29 C.F.R. § 785.27).  There is no dispute that Empress conducts a "dealer school" that offers games training to Dealers free of charge, outside their work hours and without compensation.  (*Id.* ¶¶ 39-41; Deering Decl. ¶¶ 17; Foster Decl. ¶ 16; Herron Decl. ¶ 13;

Hinckle Decl. ¶ 10).  Empress insists, however, that Dealers are not required to take training classes, and they are therefore voluntary.[11]

Plaintiff counters that the training is not voluntary, and points to a recent job posting for a Dealer position, which stated that applicants must be "willing to learn all games offered in the casino."  (Doc. 30-2, Ex. 2).  Further, she argues that Empress makes it clear to employees that "failure to participate in training courses could adversely impact . . . employment."  (Pl. Decl. ¶ 44).  Bender, for example, believes that his managers punished him for quitting a roulette training course by assigning him to a single BlackJack table.  This resulted in him not being part of the Dealer "road map" and being forced to always work the same table.  (Bender Decl. ¶ 24).  Bender also maintains that Johnson, Sikirdji and Costa told him on multiple occasions that he needed to learn more games.  On at least one occasion, moreover, either Johnson or Sikirdji said that Bender "needed to 'better myself' by learning more games."  (*Id.* ¶ 25).

Rapka did not learn any new games during his last three years of employment, but he, Bender and Plaintiff all received comments about their experience level in performance reviews.  In Bender's 2008 review, Empress management gave him a "3" (Meets Expectations) for "Passion for Involvement," and stated that "Bruce could improve this

---

[11]     Between March and June 2009, Empress was closed for reconstruction due to a fire on the premises.  (Deering Decl. ¶ 17).  During that time period, Empress paid Dealers and Slot Reps their full regular rate of pay plus half of their "toke" or tip rate, even though they were not working in the casino.  (*Id.*; Taylor Decl. ¶ 13).  As a result, Empress required Dealers who did not know all of the games offered in the casino to take a class and learn a new game.  Empress explains that "attending classes was a specific job duty for which Dealers were paid during that three-month period."  (Doc. 55, at 7).  The Court understands that Plaintiff is not seeking to recover for training courses completed during the reconstruction period.  (Pl. Dep., at 56-57).

score by learning another game." (Doc. 83, Ex. C, at 26). Bender's 2009 review indicated that he "should strive to master more aspects of [my] position, such as learning Craps or Roulette, to give [me] a more rounded dealing experience." (Bender Decl. ¶ 26). Bender's 2010 review similarly stated that he "should strive to learn more games so [that I] can have the opportunity to work with more of our guests." (*Id*.). Rapka's 2009 review commented that "[b]y learning additional games, Billy will be able to expand his knowledge and prove to be a greater asset to the department as well as the company." (Rapka Decl. ¶ 24). Plaintiff, like Bender, received a "3" in "Passion for Involvement" in her 2008 performance review. The reviewer stated that "by learning live poker or craps, Rosa will be able to expand her job knowledge." (Doc. 83, Ex. B, at D00198). After Plaintiff learned craps in 2010, her annual rating that year went up to "4" (Exceeds Expectations) for "Passion for Involvement." (*Id.*, Ex. A, at D00179).

Empress contends that regardless of these reviews, the casino has never terminated or laid-off a Dealer due to lack of games knowledge. Nor do managers tell or suggest to Dealers that their jobs will be adversely affected if they do not learn new games. (Deering Decl. ¶ 20; Hejna Decl. ¶ 16; Herron Decl. ¶ 15; Foster Decl. ¶ 15; Hinckle Decl. ¶ 11). The mere fact that various supervisors and managers encouraged employees to learn new games, Empress argues, is not enough to demonstrate that the training was mandatory. (Doc. 87, at 2). Plaintiff notes that she does not have to show that the training is mandatory in order to demonstrate that it is "not voluntary." Rather, the regulations explain that training is not voluntary if an employee is "given to understand or led to believe that his present working conditions or the continuance of his employment would be adversely affected by nonattendance." 29 C.F.R. § 785.28. Plaintiff and the Opt-Ins claim that they

have presented evidence that Empress led Dealers to believe that they needed to learn more games in order to be "better" and "more valuable" employees.

Empress disagrees, noting that Plaintiff, Rapka and Bender "were all long-tenured Dealers at Empress and took *years* to learn new games." (Doc. 87, at 3) (emphasis in original). Plaintiff, for example, expressed a goal to learn craps in 1994, 1995 and 1996, but she did not actually take the craps class until 2009. (Deering Decl. 2 ¶¶ 5-7; Doc. 87-1, Exs. A-C; Pl. Dep., at 56). Rapka, similarly, stated in 1999, 2002, 2007 and 2008 that it was his goal to learn craps, yet he still had not learned the game by the time of his termination in 2011. (*Id.* ¶¶ 11, 14, 15). Plaintiff suggests that there may not have been any craps classes available that accommodated her work schedule. (Pl. Dep., at 184). Perhaps, but it is somewhat difficult to believe that Plaintiff truly thought that her job would be adversely affected by failing to take training classes when she appears to have suffered no adverse consequences in that regard for more than 15 years as an Empress employee. The same is true of Rapka.

Regardless, for purposes of a step one analysis, the Court generally refrains from considering the merits of the case or witness credibility. *See Alexander*, 2011 WL 2550830, at *2 (at step one of the certification analysis, "it is not proper for the Court to assess the credibility of statements made in plaintiff['s] declaration."); *Marshall*, 2010 WL 2404340, at *3; *Blakes*, 2011 WL 2446598, at *6. At this very early stage of the proceedings, Plaintiff has made at least a modest factual showing that Dealers must engage in job-related training. The Dealer job description requires a willingness to learn new games, Bender says he was punished for dropping a roulette class, and Plaintiff and

Bender both insist that Empress managers told them they would be more valuable employees if they learned more games. (Pl. Dep., at 196; Bender Decl. ¶ 25).

Empress argues that even if the training is not voluntary, it also is not job related and, thus, is not compensable work as defined under the regulations. (Doc. 87, at 4). Training is "directly related" to an employee's job "if it is designed to make the employee handle his job more effectively as distinguished from training him for another job, or to a new or additional skill." 29 C.F.R. § 785.29. Empress contends that gaming classes teach Dealers a new skill. (Doc. 87, at 4). As Plaintiff notes, however, by learning new games, Dealers help "minimize labor costs while maximizing the number of table games available." (Doc. 88, at 4). A Dealer who learns more games is arguably able to handle his job more effectively because his knowledge of multiple games means that he can be assigned to more "strings." Once again, for purposes of step one of the certification analysis, Plaintiff has made a sufficient showing that Dealers are factually bound by the requirement that they take unpaid, job-related training classes.

**D.     Notice**

The Court finally turns to Plaintiff's proposed Notice and Consent forms. In FLSA cases, "the court has 'a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way.'" *Howard v. Securitas Security Servs., USA Inc.*, 630 F. Supp. 2d 905, 907 (N.D. Ill. 2009) (quoting *Hoffmann-La Roche Inc.*, 493 U.S. at 170-71). In order to ensure that notice is "timely, accurate, and informative," a court should "monitor[] preparation and distribution of the notice as early in the case as is practicable." *Id.* (quoting *Hoffmann-La Roche*, 493 U.S. at 171). "Court-approved notice ensures that putative class members receive 'accurate

31

and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate.'" *Id.* (quoting *Hoffmann-La Roche*, 493 U.S. at 170). Such notice also limits "opportunities for abuse" in the class action process, including misleading communications. *Hoffmann-La Roche*, 493 U.S. at 171.

To effectuate notice in this case, Plaintiff seeks putative plaintiffs' "names, addresses, e-mail addresses, dates of employment, location of employment, [and] social security and telephone numbers in an excel spreadsheet format." (Doc. 30-1, at 20 and Ex. 3). Empress objects to the proposed notice on several grounds, and opposes the requested discovery. The Court discusses each issue in turn.

### 1. Class Definition

The parties agree that the FLSA has a three-year statute of limitations for willful violations. 29 U.S.C. § 255. They disagree, however, as to how to calculate that three-year period for purposes of the notice. Plaintiff's proposed Notice defines the collective to include all current and former Dealers and Slot Reps who worked at Empress "during the period beginning three years prior to the filing of the original complaint (i.e., January 3, 2008) through the present." (*Id.* at 18). Empress argues that the three-year period should be calculated instead from the date of the Notice. (Doc. 55, at 31). In response, Plaintiff claims that Empress agreed on June 2, 2011 to toll the statute of limitations pending resolution of a motion to dismiss, and suggests that this date represents a fair compromise. (Doc. 58-1, at 21). Empress disputes this, and Plaintiff provides no documentary support for the alleged June 2, 2011 agreement.

The Court finds that the tolling of the limitations period lasted at most one week. The tolling issue was first discussed during a status hearing before this Court on May 13,

2011. Defendants' counsel indicated that Empress would agree to a stay as to Dealers and Slot Reps who worked at Empress if that meant the casino would not have to respond to Plaintiff's certification motion prior to a ruling on the pending motion to dismiss. The parties did not conclusively resolve the issue at that time, but shortly thereafter, on May 19, 2011, Defendants' counsel sent the Court a letter (copied to opposing counsel) confirming that Empress agreed to toll the statute of limitations from May 13, 2011 until the Court ruled on the motion to dismiss.

As it turned out, the Court ruled on the motion to dismiss the following day on May 20, 2011. (Doc. 37). Under the circumstances, the three-year period will be calculated from the date of the Notice unless Plaintiff has a feasible proposal for how to incorporate the one-week stay.

## 2. Opt-In Period

Empress next objects to giving potential plaintiffs 120 days to decide whether they wish to consent to be in the case. In Empress's view, a 45-day opt-in period is reasonable and sufficient. *Garcia v. Salamanca Group, Ltd.*, No. 07 C 4665, 2008 WL 818532, at *5 (N.D. Ill. Mar. 24, 2008) (adopting 45-day opt-in period); *Mielke v. Laidlaw Transit, Inc.*, No. 00 C 0669, 2003 WL 134996, at *5 (N.D. Ill. Jan. 17, 2003) (same). Plaintiff disagrees, and proposes a 90-day opt-in period by way of compromise. (Doc. 58-1, at 22). She expresses concern that "turn over at the casino may be higher than expected because of the stringent rules that are used to justify terminations (e.g. failure to clock in three times subjects an employee to termination)." (*Id.* at 21-22). She also notes that putative plaintiffs may have left Empress when the casino temporarily shut down after a fire in the summer of 2009. (*Id.* at 21).

33

Courts in this circuit have approved opt-in periods ranging from 45 to 120 days. *See Anyere*, 2010 WL 1542180, at *4 (deferring to the plaintiffs' request for a 120-day opt-in period "based on their representation that this length of time is necessary because the potential class is transitory and there is a high turnover rate, meaning that additional investigation may be required in order to contact potential opt-in plaintiffs."); *Sharpe v. APAC Customer Servs., Inc.*, No. 09-CV-329-BBC, 2010 WL 1292154, at *2 (W.D. Wis. Mar. 29, 2010) (holding that 60-day opt-in period was sufficient); *Kelly v. Bluegreen Corp.*, 256 F.R.D. 626, 632 (W.D. Wis. 2009) (adopting plaintiff's suggested 90-day opt-in period without objection from the defendant); *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, No. 08 C 488, 2008 WL 5263750, at *6 (E.D. Wis. Dec. 18, 2008) ("There is no indication why 45 days, an opt-in period ordered by other courts in FLSA actions, would not be sufficient time under these circumstances."); *Champneys v. Ferguson Enterprises, Inc.*, No. IP-02-535-C-H/K, 2003 WL 1562219, at *7 (S.D. Ind. Mar. 11, 2003) (adopting 45-day opt-in period).

Given the relatively small number of potential class members who worked as Dealers and Slot Reps at this single casino during a three-year period, the Court concludes that a 60-day opt-in period is reasonable and will fairly balance the parties' competing concerns. Plaintiff is ordered to amend the Notice accordingly.

### 3. Potential Costs Against Opt-In Plaintiffs

The parties disagree as to whether the Notice should inform potential plaintiffs that they may have to pay Empress's fees and costs in the event the lawsuit is unsuccessful. Empress urges the Court to follow *Garcia v. Elite Labor Serv., Ltd.*, No. 95 C 2341, 1996 WL 33500122 (N.D. Ill. July 11, 1996), in which the court modified the plaintiff's proposed notice to state: "[I]f you do not prevail on your claim, court costs and expenses may

possibly be assessed against you." *Id.* at *4. *See also Wright v. Lehigh Valley Hosp. and Health Network*, Civ. A. No. 10-431, 2011 WL 221770, at *7 (E.D. Pa. Jan. 20, 2011) ("Courts . . . have required named plaintiffs to include information about this possibility [of having to pay the prevailing defendant's costs] in the notice sent to potential opt-in plaintiffs.")

Plaintiff insists that *Anyere* articulates a better-reasoned approach. The plaintiffs in *Anyere* agreed to "inform any potential plaintiff who contacts plaintiffs' counsel's office regarding the opt-in process" that they "may share in liability for payments of costs if [the defendant] prevails." *Id.* at *5. As a result, the court determined that the notice did not need to contain this information. *Id.*

The Court agrees that the Notice should contain at least some language concerning the cost issue, without giving it undue emphasis. Otherwise, potential plaintiffs will be unaware of the possibility that costs must be paid absent a call to Plaintiff's counsel. Plaintiff shall draft proposed language for submission to the Court.

### 4.      Non-Retaliation Provision

In her proposed Notice, Plaintiff includes the following section regarding retaliation:

### IV. YOU ARE PROTECTED FROM RETALIATION

In the event you wish to join, the FLSA provides that it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA], or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). **Penn National Gaming, Inc. has taken the position that it will not retaliate against anyone for participating in this case**.

(Doc. 30-2, Ex. 3, at 3). Empress seeks to replace this section with the following language:

It is a violation of federal law for Defendants to discharge you in retaliation for your participating in this lawsuit or take any other adverse employment action against you because you have exercised your legal right to join this lawsuit.

(Doc. 55, at 33). In her reply brief, Plaintiff suggests that the language be modified to state simply, "Penn National Gaming will not retaliate against anyone for participating in this case." (Doc. 58-1, at 22-23).

Neither party has cited any supporting case law, but in *Craft v. Ray's, LLC*, No. 1:08-CV-00627-RLY-JMS, 2008 WL 5458947 (S.D. Ind. Dec. 31, 2008), the court adopted non-retaliation language identical to that suggested by Empress. *Id.* at *2. The Court accepts Empress's proposal in that regard.

## 5.    Consent Forms Directed to the Clerk of Court

Empress claims that signed consent forms should be sent to the Clerk of Court rather than to Plaintiff's counsel. (Doc. 55, at 33). Empress directs the Court to *Burns v. Village of Wauconda*, in which the court indicated that it would not approve a proposed notice that instructed putative plaintiffs to send their consent forms to the plaintiffs' counsel. 1999 WL 529574, at *3. The court stated that it is "more appropriate" to send those forms to the court. *Id. See also Mielke*, 2003 WL 134996, at *3 (notice to the Clerk of the Court "provided a neutral and fair method of returning the forms which would also provide for assurance that the form was received by the correct deadline."); *Garcia*, 1996 WL 33500122, at *5 ("[I]t is appropriate to have the consent forms sent to the Clerk of the Court, rather than counsel for [the plaintiff]" in order to "avoid controversy over filing dates.")

Plaintiff attempts to distinguish *Garcia* but does not address the other cases. Rather, she notes that her attorneys contacted the Clerk's office and learned that "with one exception no one could recall having consents sent to them." She also stresses that "the

clerk's office stated it much prefers that Plaintiff's counsel file the consents because Plaintiff's counsel can file them electronically." (Doc. 58-1, at 23 n.16). In the interests of compromise, Plaintiff proposes that she modify the Notice to state: "[Y]ou must return the signed consent form to Plaintiffs' counsel within [60] days or have your own attorney file it with the Court within [60] days." (*Id.* at 23).

In the Court's view, the better practice here is to have putative class members send their consent forms to Plaintiff's counsel, and not to the Clerk's office. To the extent that Empress is willing to pay for a third-party administrator to collect and file the consents, the Court will order this method.

### 6.    Discovery

Empress finally claims that "the Court should order Defendant to produce the names and addresses of the putative class to a third party administrator, so that the third-party administrator may issue the notice." (Doc. 55, at 34). Empress explains that this will allow prospective plaintiffs "to make an independent and objective decision as to whether they want to participate in the lawsuit, without being pressured, harassed or repeatedly solicited by Plaintiff's counsel." (*Id.*). Empress also raises concerns about class member privacy. (*Id.*) (citing *Wren v. Rgis Inventory Specialists*, No. C-06-05778-JCS, 2007 WL 4532218, at *9 (N.D. Cal. Dec. 19, 2007)) (where the plaintiffs offered no objection, the court ordered that contact information be produced to a third-party administrator to protect employee privacy).

Plaintiff objects that a third-party administrator would be unnecessary, costly and inefficient, and notes that courts in this district have rejected the argument that the privacy rights of potential class members outweigh a Plaintiff's need for contact information. (Doc.

58-1, at 26). In *Acevedo v. Ace Coffee Bar, Inc.*, 248 F.R.D. 550 (N.D. Ill. 2008), for example, the court considered whether the plaintiffs had a compelling need for the names, addresses and telephone numbers of putative class members and, if so, whether that need outweighed the employees' privacy rights. *Id.* at 554. The court held that "[d]ue process requires an opportunity to discover this information at the present stage of litigation, and such due process rights are more compelling than the privacy rights of potential plaintiffs' addresses and phone numbers." *Id.* Of course, if a third-party administrator were to be designated to issue the notices, it is unclear why Plaintiff would need the requested information.

Moreover, Plaintiff is seeking much more information than just names, addresses and telephone numbers. She also wants email addresses, dates and location of employment and social security numbers. Plaintiff does not explain why she needs this additional information. As a result, the Court finds that Empress must provide only names, addresses, email addresses and telephone numbers at this time. Empress will inform the Court by October 13, 2011 whether it wishes to pay for a third-party administrator to process the information. If not, the information will be produced to Plaintiff, but the parties may draft "[a] protective order limiting the use of this information to its intended purposes." *Russell*, 575 F. Supp. 2d at 939.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Judicially Supervised Notice Under 29 U.S.C. § 216(b) [30] is granted as to Defendant Empress. Empress's Motion to Strike Statements in Rosa Nehmelman's and Ross Sansone's Declarations [47] is denied.

ENTER:

Dated: September 29, 2011

_____

SHEILA FINNEGAN
United States Magistrate Judge